FRANCIS ONTAI, Plaintiff-Appellant, *v.* STRAUB CLINIC AND HOSPITAL INC., Defendant-Appellant, and GENERAL ELECTRIC COMPANY, Defendant-Appellee, and JOHN DOES I-X, JOHN DOE PARTNERSHIPS I-X, JOHN DOE CORPORATIONS I-X, JOHN DOE GOVERNMENTAL ENTITIES I-X, Defendants

NOS. 7237 & 7342

CIVIL NO. 48724

FEBRUARY 18, 1983

LUM, ACTING C.J., NAKAMURA, J.,
RETIRED JUSTICES OGATA AND MENOR
ASSIGNED TEMPORARILY*

---

* Chief Justice Richardson, who heard oral argument in this case, retired from the court on December 30, 1982. HRS § 602-10 (1982 Supp.) provides: "After oral argument of a case, if a vacancy arises or if for any other reason a justice is unable to continue on the case, the case may be decided or disposed of upon the concurrence of any three members of the court without filling the vacancy or the place of such justice."

238

OPINION OF THE COURT BY MENOR, J.

This is a consolidated appeal by plaintiff Francis Ontai ("Ontai") from the directed verdict entered against him by the lower court in favor of defendant-appellee General Electric Company ("G.E."), and by defendant Straub Clinic and Hos-

pital, Inc. ("Straub") from the dismissal of its cross-claim against G.E.

On March 1, 1976, plaintiff Ontai went to Straub for an air contrast barium enema examination of the colon. The examination took place in Room 62, also referred to as Room 2, of Straub. This examination involved taking X-rays of Ontai in various positions, some of which required that the X-ray table be tilted to a near vertical position. Ontai remained on the X-ray table during this procedure. While the table was in this near vertical position, the footrest at the bottom end of the table gave way, and Ontai fell to the floor of the examination room. As a result, he was injured. Ontai subsequently filed suit against Straub and G.E., and Straub in turn cross-claimed against G.E. Ontai's claim against G.E. is based on strict liability in tort, negligence, and implied warranty. So, essentially, is Straub's cross-claim against G.E.

On September 11, 1978, the lower court, in a jury trial, granted G.E.'s motion for a directed verdict against Ontai following the presentation of his case in chief. Later that same day, at the close of Straub's opening statement, the lower court granted G.E.'s motion to dismiss Straub's cross-claim.

I.

Plaintiff Ontai claims that the footrest was defective, and that G.E. was therefore answerable for Ontai's injuries on the theory of strict tort liability.

The rule of strict tort liability formulated in the *Second Restatement of Torts,* § 402A, provides that "[o]ne who sells any product in a defective condition *unreasonably dangerous* to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property. . . ." (Emphasis added) Such a condition may be the result of the manufacturing or production process, or it may arise from the design of the product itself.

This court in *Stewart* v. *Budget Rent-A-Car Corp.,* 52 Haw. 71, 470 P.2d 240 (1970), approved of the Restatement rule but eliminated the requirement that the defective product

must have been "unreasonably" dangerous to the consumer or user. The rule, as thus adopted for this jurisdiction, provides that where a seller or lessor, who is engaged in the business of selling or leasing a product, sells or leases a defective product which is dangerous to the user or consumer, and injury results from its use or consumption, the seller or lessor will be held strictly liable in tort for the injury. *Id.; see Brown* v. *Clark Equipment Co.,* 62 Haw. 530, 618 P.2d 267 (1980); *Kaneko* v. *Hilo Coast Processing,* 65 Haw. 447, 654 P.2d 343 (1982).

Under our formulation of the rule of strict products liability, the plaintiff need not show that the article was dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases or uses it.[1] *Id.; Clary* v. *Fifth Avenue Chrysler Center,* 454 P.2d 244 (Alaska 1969). It is enough that the plaintiff demonstrates that because of its manufacture or design, the product does not meet the reasonable expectations of the ordinary consumer or user as to its safety. *Id.; Cronin* v. *J.B.E. Olson Corp.,* 8 Cal.3d 121, 501 P.2d 1153 (1972); *Barker* v. *Lull Engineering Co., Inc.,* 20 Cal.3d 413, 573 P.2d 443 (1978).

In *Stewart,* this court for the first time addressed the question of strict products liability, and in finding the rule of strict liability in tort to be a sound legal basis for recovery in products liability cases, cited with apparent approval the California case of *Greenman* v. *Yuba Power Products, Inc.,* 59 Cal.2d 57, 377 P.2d 897 (1962). In that case the plaintiff had been injured when a piece of wood on which he was working flew out of his Shopsmith, which was a combination power tool usable as a saw, drill, and wood lathe. In affirming the judgment

---

[1] The Restatement rule, however, would require such a showing. Comment i of the Restatement explains that for a product to be "unreasonably dangerous" to the user or consumer because of its defective condition, "[t]he article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." We have chosen not to follow the Restatement in this regard.

against the manufacturer, the California supreme court held:

> To establish the manufacturer's liability it was sufficient that plaintiff proved that he was injured while using the Shopsmith in a way it was intended to be used as a result of a defect in design and manufacture of which plaintiff was not aware that made the Shopsmith unsafe for its intended use. [59 Cal.2d at 64, 377 P.2d at 901.]

*Greenman* was followed by *Cronin*[2] and finally by *Barker.*[3] Both cases built upon and further refined the extent and parameters of the law of strict products liability. In *Barker,* the California supreme court held:

> [A] product may be found defective in design, so as to subject a manufacturer to strict liability for resulting injuries, under either of two alternative tests. First, a product may be found defective in design if the plaintiff establishes that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner. Second, a product may alternatively be found defective in design if the plaintiff demonstrates that the product's design proximately caused his injury and the defendant fails to establish, in light of the relevant factors, that, on balance, the benefits of the challenged design outweigh the risk of danger inherent in such design. [20 Cal.3d at 432, 573 P.2d at 455-456.]

---

[2] In Cronin the plaintiff was driving a bread delivery truck when an aluminum safety hasp securing the bread racks failed in a collision, thus permitting the racks to enter the driver's compartment and propelling the plaintiff through the windshield.

[3] In Barker the plaintiff was injured while operating a high-lift loader. He claimed that it was a design defect which caused his load to tip and fall on him.

[4] A few months after deciding Barker, the California supreme court in Daly v. General Motors Corp., 20 Cal.3d 725, 575 P.2d 1162 (1978), sanctioned the application of comparative negligence principles in strict products liability cases, holding that these two concepts were not necessarily incompatible. This court has since followed suit, *see* Kaneko v. Hilo Coast Processing, *supra.*

We think the holdings of both *Cronin* and *Barker* are logical extensions of the *Greenman* principles which this court in *Stewart* found to be sound, and we see no reason why the *Barker* formulations may not be made to apply in this jurisdiction.[4] Under either test, it would still be incumbent upon the plaintiff to show that the offending product was dangerously defective and that the defect was the proximate cause of his injuries. *Stewart* v. *Budget Rent-A-Car Corp., supra.* Ontai, in the present case, was thus required to show: (1) a defect in the footrest which rendered it dangerous for its intended or reasonably foreseeable use, and (2) a causal connection between the defect and his injuries.

The failure of the manufacturer to equip its product with a safety device may constitute a design defect. *See Brown* v. *Clark Equipment Co., supra* (shovel loader without outboard rear view mirrors); *Pike* v. *Hough,* 2 Cal.3d 465, 467 P.2d 229 (1970) (paydozer without rear view mirrors); *Garcia* v. *Halsett,* 3 Cal. App.3d 319, 82 Cal.Rptr. 420 (1970) (clothes washer with no safety switch); *Beerman* v. *Toro Manufacturing Corp.,* 1 Haw.App. 111, 615 P.2d 749 (1980) (defectively designed power lawn mower). *See also Boudreau* v. *General Electric Co.,* 2 Haw.App. 10, 625 P.2d 384 (1981) (washer-dryer window not tempered). In the present case, Ontai claims that the subject footrest was defective in two respects: (1) that it lacked a safety device which would indicate to the person installing the footrest upon the X-ray table that it was securely engaged; and (2) that the footrest lacked a mechanism which could be adjusted to compensate for wear in certain critical parts of the latching mechanism. Ontai, in other words, claims a design defect.

In granting G.E.'s motion for directed verdict against Ontai, the court did not spell out the reason or reasons for its decision. However, at a later stage in the trial when it granted G.E.'s motion to dismiss Straub's cross-claim, the trial court did explain:

THE COURT: The Court is eminently satisfied that there is no design defect in Exhibit A [subject footrest] but if it was properly installed this accident would not have happened. This is clear. It is common sense.

In passing upon a defendant's motion for directed verdict at the close of the plaintiff's case, the trial court must disregard conflicting testimony and view the evidence, and all legitimate inferences that can be drawn therefrom, in the light most favorable to the plaintiff. *Stewart* v. *Budget Rent-A-Car Corp., supra.* The motion for directed verdict may be granted thereafter only if it can be said that there is no evidence to support a jury verdict in favor of the party against whom the motion is presented. Otherwise, it must be denied. *Id.* The trail court was obviously of the opinion that the footrest had not been properly installed. Yet, the testimony of the installer, Richard Piscusa, shows otherwise. In passing upon the motion, the court was required to give credence to his testimony. There is nothing in the record to indicate that it was so inherently incredible and implausible as to be unworthy of belief.

On the date of the accident Piscusa, then a second year student X-ray technician at Straub, was working in Straub's X-ray department. He explained to the court and jury how he had engaged the footrest to the X-ray table. He made the connection by holding the footrest in both hands, sliding it up from the bottom of the X-ray table until the keys located on each wing of the footrest had dropped into their assigned grooves or notches on the X-ray table. He heard a click, maybe two clicks sounding simultaneously, indicating that the keys on both sides of the footrest had fallen into their slots. He also felt both keys go in at the same time. To satisfy himself that the footrest was positively engaged to the table, he tugged on the footrest with a forward and backward motion simulating weight being put on the footrest. It stayed in place. According to Piscusa these were the normal and correct procedures for installing the footrest and to insure that it was positively engaged. He had made the installation many times before without incident and could not understand why it had become disengaged when Ontai was being X-rayed. The footrest held Ontai's weight for about 30 seconds before it gave way.

Clement Kanhai, a registered technician employed at Straub, corroborated Piscusa's testimony as to the correct procedures for attaching the footrest to the X-ray table and in verifying its engagement with the table. There was also testim-

ony by Dr. Robert May, the radiologist who did the air contrast barium enema procedure on Ontai, that supports Piscusa's testimony that Ontai was in the elevated position on the footrest long enough for an X-ray picture to have been taken.

The subject footrest which we will hereinafter refer to as Exhibit A was a detachable component of a reconditioned Monarch 90 model X-ray table sold by G.E. to Straub in 1974. It is a relatively heavy piece of equipment and when in use must contend with both the force of gravity and the weight of the patient being examined. Subsequent to Ontai's accident which occurred on March 1, 1976, Straub purchased another footrest from G.E. which we will refer to as Exhibit B. This latter footrest was designed by G.E. in 1966, some eight years before it sold Exhibit A to Straub. Exhibit B is equipped with a safety latch which would indicate to the installer whether the footrest is securely and properly installed. It also has additional safety features which would allow for adjustments to be made to compensate for excess clearances in coupling mechanisms occasioned by foreseeable wear and tear. These adjustments could be made to prevent a properly installed footrest from being accidentally disengaged. Exhibit A was not built with similar safety latches or with similar safety features regarding adjustments for excess clearances. Yet, such safety features were already in use by G.E. and within the state of the art when Exhibit A was sold to Straub in 1974. *Brown* v. *Clark Equipment Co., supra.*

Bruce Wong, who was Ontai's expert in the area of design, mechanical, and metallurgical engineering, testified that in tests he conducted of the X-ray table and the Exhibit A footrest, he found that it was possible for Exhibit A to become disengaged even after it was properly installed. He demonstrated this by exerting a push-pull force of about 20 pounds, and with this movement was able to disengage the right arm of the footrest from the X-ray table. In explaining the significance of his findings, Mr. Wong testified:

THE WITNESS: Why did I perform that test?

MR. O'CONNOR: Yes.

THE WITNESS: To show that the right arm will

disengage itself when a force is applied to the footrest.

Q (By Mr. O'Connor) And as an engineer, did you feel this was significant in this particular case that we have got?

A I believe so.

Q Why did you feel it was significant in this particular case that we have got?

A It explains one of the possibilities or modes at which the key got out of the slot.

Q And that would assume that in the Ontai situation, Mr. Ontai's case, the keys were in the slot when he got on the table; is that right?

A If the keys were in the slot, then it could be disengaged from the slot. That is one possible action.

Q Could also be — Now, is there a design feature about Exhibit A which would allow the operator to know or should allow the operator to know that the keys are not in the slot?

A Not an obvious feature standing from behind.

Q In other words, an operator wouldn't have an obvious thing that he could look at to tell him that the keys were not in the slot?

A That's right.

Mr. Wong also testified that in his opinion Exhibit A could have been designed to include the safety features which were essential components of Exhibit B.

On the basis of the foregoing, we think that Ontai did meet his burden of showing, at least as against a motion for directed verdict, that the Exhibit A footrest was in some way dangerously defective and that this defect was the proximate cause of his injuries. *Stewart* v. *Budget Rent-A-Car Corp., supra.* Richard Piscusa, the student technician then working at Straub, maintained that he properly installed the footrest. He had installed it as he had installed footrests many times before without incident. Clement Kanhai, a registered X-ray technician also employed at Straub, confirmed that the method followed by Piscusa was the correct installation procedure. Finally, Bruce Wong, the plaintiff's expert, pointed out that certain safety features which G.E. itself utilized in the manufacture of similar footrests could have been incorporated in the Exhibit A footrest. These features, which consisted of safety

latches and a plastic screw or bolt which would compensate for possible wear on the latching mechanism of the footrest, were already within the state of G.E.'s own art and would have made the offending footrest safer for its intended or foreseeable use. Thus, the jury reasonably could have found the absence of these safety features to have been a design defect which was a proximate cause of Ontai's injuries.

Ontai also contends that G.E. was negligent in designing the Exhibit A footrest and in failing to warn Straub of latent dangers inherent in installing the footrest. The legal duty of manufacturers, such as G.E., to exercise reasonable care in the design and incorporation of safety features to protect against foreseeable dangers is well established. *Powell* v. *E.W. Bliss Co.,* 346 F.Supp. 819 (W.D. Mich.1972); *see also Byrnes* v. *Economic Machinery Co.,* 41 Mich. App. 192, 200 N.W.2d 104 (1972). This court has also made it clear that plaintiffs in design defect cases may proceed on both a theory of negligence for negligent design and a theory of strict liability in tort for defective design. *Brown* v. *Clark Equipment Co., supra.*

The question we face here is essentially the same question we were faced with in *Brown,* namely, whether G.E. was negligent for failing to provide safety devices. *See Byrnes* v. *Economic Machinery Co., supra; Ilnicki* v. *Montgomery Ward Co.,* 371 F.2d 195 (7th Cir. 1966); *Pike* v. *Hough, supra; Wright* v. *Massey-Harris, Inc.,* 68 Ill.App.2d 70, 215 N.E.2d 465 (1966).

In *Brown,* there was evidence that the placement of the rear window and the rear view mirrors in the loader cab left a 30-foot blind spot to the rear of the loader which could have been eliminated by properly placed outboard rear view mirrors. Such mirrors had already been developed and were available upon request for $25.00. There was also evidence that these mirror kits were not included in the defendant manufacturer's equipment catalogue nor were purchasers notified that such kits were available. The holding of this court was that there was sufficient evidence from which a jury could conclude that Clark "negligently designed the loader with restricted visibility and was negligent in failing to equip the loader with mirrors correcting the restricted visibility or in failing to notify

purchasers of the loader that said mirrors were available." *Id.,* 62 Haw. at 538, 618 P.2d at 272.

General Electric should not be allowed to escape liability if the risk to which Ontai was exposed was unreasonable and foreseeable by G.E. Certainly, the fact that the subject footrest might disengage by the same method used to verify for positive engagement was not patently obvious. There were no signs of warnings giving notice of such a danger. Neither Straub nor Piscusa was expected to appreciate the subtle mechanical operation which could cause the footrest to disengage. Further, there was evidence that this danger could have been eliminated by the incorporation of safety latches which had already been designed by G.E. prior to the time Straub bought the Monarch 90 X-ray table and footrest from G.E. There was evidence that a footrest with such safety latches was available for purchase. Exhibit B is an example.

The courts have frequently ruled that a manufacturer must give appropriate warning of any known dangers which the user of its product would not ordinarily discover. *See, e.g., Tingey* v. *E.F. Houghton and Co.,* 30 Cal.2d 97, 179 P.2d 807 (1947). There is a particular need for an adequate warning where, as here, there is evidence that the footrest may become disengaged from its connecting slot on the X-ray table if a force is applied to it. The likelihood of an accident taking place and the seriousness of the consequences are always pertinent matters to be considered with respect to the duty to provide a sufficient label. *Tingey* v. *E.F. Houghton and Co., supra.*

A duty to warn actually consists of two duties: One is to give adequate instructions for safe use; and the other is to give a warning as to dangers inherent in improper use. *Seibel* v. *Symons Corp.,* 221 N.W.2d 50 (N.D. 1975). We believe there was enough evidence from which a jury could have found that G.E. had breached its duty to warn. There was testimony by Dr. May that G.E. did not provide Straub with an operations manual for use of the X-ray table and the Exhibit A footrest. There was also no evidence in the record that G.E. used other means of warning Straub as to dangers inherent in the improper use of the footrest, such as a warning label on the footrest itself. Furthermore, we think that even though Piscusa may have been negligent in attaching the footrest to the X-ray

table, his negligence in and of itself would not necessarily exempt G.E. from liability for Ontai's injuries. This court has held that a third party's negligence is not a defense unless such negligence is the sole proximate cause of the plaintiff's injuries. *Brown* v. *Clark Equipment Co., supra.* The test to determine whether an intervening negligent act is a superseding cause is one of foreseeability of the third person's conduct. *Id.*

Therefore, under Ontai's theory of negligence, there was evidence from which the jury could conclude that G.E. was negligent, and that its negligence, in failing to design a safe product and in failing to warn Straub of latent dangers inherent in installing the footrest, was a proximate cause of Ontai's injuries.

Ontai's third cause of action against G.E. is based on the theory of implied warranty. Although Ontai was not in privity with G.E. in the sale of the X-ray table and footrest, the warranty to Straub from G.E. extends to Ontai by statute, as a third party beneficiary, *see* HRS § 490:2-318.[5]

Ontai's claim is somewhat ambiguous. Although he refers to a breach of the implied warranty of fitness, he cites HRS § 490:2-314, warranty for merchantability, as authority. Upon review of the record, however, we think there was sufficient evidence from which the jury could have found that G.E. breached its implied warranties both of fitness and of merchantability.

The implied warranty of merchantability[6] is perhaps the

---

[5] HRS § 490:2-318 provides:
Third party beneficiaries of warranties express or implied. A seller's warranty whether express or implied extends to any person who may reasonably be expected to use, consume or be affected by the goods and who is injured by breach of the warranty. A seller may not exclude or limit the operation of this section with respect to injury to the person of an individual to whom the warranty extends.

[6] Hawaii's Uniform Commercial Code, HRS § 490:2-314 states:
Implied warranty: merchantability; usage of trade.
(1) Unless excluded or modified (section 490:2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.

broadest warranty in the Uniform Commercial Code. *Schenck v. Pelkey,* 176 Conn. 245, 405 A.2d 665 (1978). This warranty is implied by operation of law into every sale of goods by a merchant seller. *Id., Hauter* v. *Zogarts,* 14 Cal.3d 104, 534 P.2d 377 (1975). Merchantability, as provided in Hawaii's statute, means, *inter alia,* that the goods "are fit for the ordinary purpose for which such goods are used." HRS § 490:2-314(2)(c). In contrast, the implied warranty of fitness for a particular purpose is narrower and more specific. *Schenck* v. *Pelkey, supra; see* HRS § 490:2-315.[7] As provided in HRS § 490:2-315, the essential components of an implied warranty of fitness are that the seller has reason to know of the particular purpose for which the goods are required, and that the buyer relies on the seller's expertise in supplying a suitable product. And as stated in comment 1 to HRS § 490:2-315:

> Whether or not this warranty arises in any individual case is basically a question of fact to be determined by the circumstances of the contracting. *Under this section the buyer need not bring home to the seller actual knowledge of the particular purpose for which the goods are intended or of*

---

(2) Goods to be merchantable must be at least such as

    (a) Pass without objection in the trade under the contract description; and

    (b) In the case of fungible goods, are of fair average quality within the description; and

    (c) Are fit for the ordinary purposes for which such goods are used; and

    (d) Run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved;

    (e) Are adequately contained, packaged, and labeled as the agreement may require; and

    (f) Conform to the promises or affirmations of fact made on the container or label if any. . . .

[7] HRS § 490:2-315 provides:

Implied warranty: fitness for particular purpose. Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.

*his reliance on the seller's skill and judgment, if the circumstances are such that the seller has reason to realize the purpose intended or that the reliance exists. The buyer, of course, must actually be relying on the seller.* (Emphasis added)

The X-ray table and its component footrest together comprised a specialized piece of equipment, and the purpose of the footrest at the bottom end of the X-ray table was obviously to prevent a person from falling off the X-ray table when it was tilted. G.E. obviously knew, or should have known, the particular purpose for which Straub purchased the equipment. It is equally obvious that Straub was relying on G.E.'s expertise.

Moreover, as discussed *supra,* the jury could have found that the footrest was defective. And it has been held that where a product is defective, even when the defect is not detectable by the seller, the seller is liable under both the implied warranty of merchantability and the implied warranty of fitness for a particular purpose. *Vlases* v. *Montgomery Ward & Co.,* 377 F.2d 846 (3d Cir. 1967) (sale of diseased chicks). In *Vlases,* the court explained:

> The entire purpose behind the implied warranty sections of the Code is to hold the seller responsible when inferior goods are passed along to the unsuspecting buyer. What the Code requires is not evidence that the defects should or could have been uncovered by the seller but only that the goods upon delivery were not of a merchantable quality or fit for their particular purpose. If those requisite proofs are established the only exculpatory relief afforded by the Code is a showing that the implied warranties were modified or excluded by specific language under Section 2-316. Lack of skill or foresight on the part of the seller in discovering the product's flaw was never meant to bar liability. The gravamen here is not so much with what precautions were taken by the seller but rather with the quality of the goods contracted for by the buyer. [377 F.2d 846, 850.] (Footnote omitted)

*See Fredrick* v. *Dreyer,* 257 N.W.2d 835 (S.D. 1977) (sale of mobile home with defective doors, wiring and plumbing); *see also Sam's Etc.* v. *Admar Bar & Kitchen,* 103 Misc.2d 276, 425

N.Y.S.2d 743 (1980) (sale of pushcarts which lacked mobility).

## II.

We now turn to the trial court's dismissal of Straub's cross-claim against G.E. which was ordered after Straub's opening statement.

G.E.'s motion to dismiss was in effect a motion for directed verdict under Rule 50(a) of the Hawaii Rules of Civil Procedure. "A motion for a directed verdict in a nonjury case will be treated as if it were a motion to dismiss under Rule 41(b), while a motion to dismiss in a jury case will be treated as if it were a motion for directed verdict under Rule 50(a)." 9 Wright and Miller, *Federal Practice and Procedure,* § 2371 at 220 (1971). (Footnotes omitted)

This was a jury trial, and the rules governing determinations of motions for directed verdict were applicable to G.E.'s motion to dismiss. Moreover, the granting of a motion by the defendant for directed verdict after a plaintiff's opening statement is not to be lightly undertaken. *Euresti* v. *Washington Terminal Co.,* 280 F.2d 629, 630 (D.C. Cir. 1960).

> The opening statement is an opportunity for counsel to acquaint the jury with the issues in the case, his theory of the case as reflected in his pleadings, and to prepare the trial judge and the jurors for their reception and consideration of the evidence he intends to offer. He is not required to detail or to exhibit his evidence as part of such a statement. He must be given the benefit of every inference in determining the sufficiency of his opening statement. A motion for a directed verdict upon an opening statement is not the same as, or even similar to, a motion for summary judgment. *Malloy* v. *Providence Hospital,* 296 F.2d 366, 367-368 (1961). (Footnote omitted)

But in any event, having found that G.E.'s motion for directed verdict against plaintiff Ontai was improvidently granted, we are perforce constrained to make a similar finding with respect to the granting of G.E.'s motion to dismiss

Straub's counterclaim.[8] Both Ontai and Straub asserted strict products liability against G.E., as well as negligence and breach of warranty.

Reversed and remanded for further proceedings consistent with this opinion.

*David L. Turk* and *Sharon Leng* for plaintiff-appellant.

*Dennis W. E. O'Connor* and *H. William Goebert, Jr.,* (*Hoddick, Reinwald, O'Connor & Marrack,* of counsel) for defendant-appellant.

*Richard E. Stifel* and *Lani L. Ewart* (*Goodsill, Anderson & Quinn,* of counsel) for defendant-appellee.

---

[8] We need to make only one other observation and that is, that the use of depositions is governed by the provisions of Rule 32 of the Hawaii Rules of Civil Procedure.