SUSIE E. LANG, individually and as Executrix of the Estates of FRANKLIN R. LANG, deceased, and WILLARD J. LANG, deceased; FRANKLIN J. LANG, a minor, by SUSIE E. LANG, his Guardian Prochein Ami; STEVEN LANG; and KATHLEEN LANG SMITH, Plaintiffs-Appellants, *v.* BEECH AIRCRAFT CORPORATION, Defendant-Appellee, and BEECHCRAFT WEST, INC,; CONTINENTAL ENGINES; STATE OF HAWAII, DEPARTMENT OF AIRPORTS; THC FINANCIAL CORP., a Hawaii corporation; FRANCIS CRAWFORD, JR., C. A. McCLUNEY COMPANY, dba JAMES F. PIERCE FLIGHT SCHOOL; EON CORPORATION, a California corporation; AEROMARINE, INC., a Hawaii corporation; 1st DOE through 50th DOE, inclusive; 1st COMPANY through 50th COMPANY, inclusive; 1st DOE CORPORATION through 50th DOE CORPORATION, inclusive; 1st DOE NON-PROFIT CORPORATION through 50th DOE NON-PROFIT CORPORATION, inclusive and 1st DOE GOVERNMENTAL ENTITIES through 50th DOE GOVERNMENTAL ENTITIES, inclusive, Defendants

APPEAL NO. 8352

(CIVIL NO. 54622)

MAY 19, 1983

BURNS, C.J., HEEN AND TANAKA, JJ.

OPINION OF THE COURT BY BURNS, C.J.

In this wrongful death action based on the alternative theories of negligence, products liability, and breach of warranty, plaintiffs appeal the verdict in favor of defendant Beech Aircraft Corporation (Beech) which the lower court directed at the close of plaintiffs' evidence. We affirm.

Mr. Lang, a California resident, owned and regularly piloted a Beechcraft Bonanza A36. The A36 had only two fuel tanks, a left and a right. It also had only two fuel gauges, one for each tank. Its fuel tank selector valve (FTSV) had three settings: off, left tank, and right tank. The fuel gauges and the FTSV operated independently of each other.

On August 9, 1976, Mr. Lang went to defendant C. A. McCluney Company, dba James F. Pierce Flight School (Pierce), in Honolulu to rent its Beechcraft Bonanza M35 which had been manufactured by Beech in 1960. Together with an instructor from Pierce, Mr. Lang took the M35 on a .8 hour checkout ride.

The M35 had four fuel tanks: a left main, a right main, a left auxiliary, and a right auxiliary.[1] Since the instrument panel had only two fuel gauges, one for the main tanks marked "main fuel" and one for auxiliary tanks marked "aux fuel," the instrument panel had two fuel gauge selector switches (FGSSs), one for the main tanks marked "main fuel gage" and one for the auxiliary tank marked "aux fuel gage." To cause a fuel gauge to

---

[1] The M35 has a fuel injection system. More fuel than will be used is sucked out of the fuel tank into the engine. The excess amount is approximately 10 gallons per hour. Excess fuel from either main tank is returned to the tank from which it came. Excess fuel from the auxiliary tanks is deposited in the left main fuel tank. Consequently, the pilot's manual states: "Use at least 10 gallons from left main tank before use of auxiliary fuel."

indicate what amount of fuel was in the corresponding left tank, the appropriate FGSS had to be set in the down position. To cause a fuel gauge to indicate what amount was in the corresponding right tank, the appropriate FGSS had to be set in the up position. The M35's FTSV, which was located on the floor just forward and left of the pilot's seat, had four positions in the following sequence: off (10 o'clock), left main fuel tank (8 o'clock), auxiliary tanks (6 o'clock), and right main fuel tank (4 o'clock). It was not possible to move the FTSV directly between the off and right main tank positions. The fuel gauges and the FTSV operated independently of each other.

On August 11, 1976, Mr. Lang, Mrs. Lang, Franklin J. Lang, age 16, and Willard R. Lang, age 12, went for a tour on the M35. Mr. Lang, the pilot, was in the front left seat; Willard in the front right seat; Mrs. Lang in the left rear seat; and Franklin in the right rear seat. All four fuel tanks were filled prior to the flight.

During takeoff, the right door opened. They landed, secured the door, and took off again, heading for Molokai. They landed in Molokai, taxied to the end of the runway, and then headed back to Honolulu. They landed at Honolulu International Airport, stayed on the ground for no more than five minutes, then took off again on runway 4 right, heading in a northeasterly direction.

Before he died, Willard stated that during the entire flight, the FTSV was not changed from one tank to another and that the FGSSs remained in the down position.

During their ascent at somewhere from 250 to 500 feet above the ground, the engine stalled. In an attempt to return to the airport, Mr. Lang turned the M35 left. During the turn, the engine sputtered and the M35 surged. After completion of about a 160 degree turn and at approximately 35 feet elevation, the M35 stalled and fell to the ground a little northwest of taxiway alpha. Soon after impact, the M35 caught on fire. Mr. Lang and Willard subsequently died from their injuries. Mrs. Lang and Franklin were injured but survived.

After the accident, the M35's engine was tested and ran normally. Since both FGSSs were in the down position, the fuel gauges were indicating the amount of fuel in the left main and the left auxiliary fuel tanks. The fuel gauges indicated that

the left main fuel tank was full and the left auxiliary fuel tank was three-fourths full. The FTSV, however, was in the right main fuel tank position.

Each of the M35's main fuel tanks is a 25-gallon tank, of which 22 gallons are usable.[2] Each of its auxiliary fuel tanks is a 10-gallon tank and together they provide 19 gallons of usable fuel.

After the crash, the M35's meter indicated that its engine had been in operation for 1.7 hours. It uses from 11 to 16 gallons per hour depending on the power settings. In cruise flight, it uses approximately 12.5 gallons per hour. The Federal Aviation Administration (FAA) concluded that the engine stopped because the FTSV was set so that the engine was drawing fuel from the right main fuel tank which was functionally empty.

The *Pilot's Operating Handbook and FAA Approved Airplane Flight Manual for the Beechcraft Bonanza K35 and M35* (June 1975), which was in the aircraft when it crashed, states in relevant part:

FUEL
* * *

Do not take off when Fuel Quantity Gages indicate in Yellow Band or with less than 13 gallons in each main tank.
* * *

BEFORE STARTING
* * *

8. Fuel Selector Valve - SELECT LEFT MAIN TANK
* * *

11. Fuel Quantity Indicators - CHECK QUANTITY
 WARNING
Do not take off if gages indicate in yellow arc or with less than 13 gallons in each main tank.

STARTING
* * *

---

[2] Fuel is drawn from each tank via a raised stem pipe which avoids the junk that invariably gets into and settles at the bottom of such tanks.

5. Auxiliary Fuel Pump momentarily ON until fuel pressure stabilizes.

\* \* \*

BEFORE LANDING

\* \* \*

2. Fuel Selector Valve - SELECT MAIN TANK MORE NEARLY FULL

\* \* \*

----------

ENGINE FAILURE ON TAKE-OFF

\* \* \*

*If airborne and insufficient runway remains for landing:*
1. Fuel Selector Valve - SELECT OTHER MAIN TANK
2. Auxiliary Fuel Pump - ON

\* \* \*

Plaintiffs[3] sued the various defendants.[4] By the time of trial, all defendants had been dismissed from the case except Beech.[5] However, defendants Francis Crawford, Jr. (registered owner), Pierce (lessee), and Aeromarine, Inc. (maintainer) remained "as nominal parties . . . solely to make it possible for there to be a determination . . . as to the relative degree of fault by each person who may have been a joint tortfeasor in respect to any liability to the plaintiffs."[6]

The crux of the plaintiffs' case against Beech was that the design of the aircraft induced pilot error. Beech asserted the affirmative defense of contributory negligence.[7]

---

[3] The Executrix is a California executrix. Her standing to sue in Hawaii was not raised as an issue. *See Low v. Horner,* 10 Haw. 531 (1896); 31 Am. Jur. 2nd *Executors and Administrators* §§ 774, 777 (1967).

[4] In *Crawford v. Ranger Insurance Company,* 653 F.2d 1248 (9th Cir. 1981), the Ninth Circuit Court of Appeals held that Crawford was not insured by Ranger against claims arising out of the pilot's death.

[5] On June 20, 1980, the lower court authorized the Executrix to settle with Crawford, Pierce, and Aeromarine for a combined total of $200,000.

[6] This jury trial was consolidated with a jury-waived trial in Civil No. 53821 (Appeal No. 8353). Trial of the consolidated cases was bifurcated between liability and damages. The plaintiffs led off and after they rested no other party presented evidence.

At the conclusion of plaintiffs' evidence, the trial court granted Beech's motion for directed verdict under Rule 50 of the Hawaii Rules of Civil Procedure and entered judgment in favor of Beech against plaintiffs.

On appeal, the plaintiffs raise two issues:[8]

1. Plaintiffs contend that the trial court abused its discretion[9] in refusing to allow plaintiffs' expert to give his opinion on technical reasons why the cockpit design confused Mr. Lang. We disagree.

The relevant interchange occurred as follows:

[DEFENDANT'S COUNSEL ON VOIR DIRE] Q And is it correct to say that you're going to testify as to the possible confusion that can arise because of this aircraft it's possible to have one tank used for fuel while your fuel gauge shows what's the amount of fuel in another tank?

A That's correct.

Q And based upon your belief as to possible confusion, you're going to give an opinion as to whether this is a good system or a bad system?

A That's correct.

\* \* \*

[DEFENDANT'S COUNSEL]: It's our position, Your Honor, that the question of possible confusion from this system is not — and whether or not that possible confusion exists and whether that makes this a bad or a good system — is evidence and can be determined by the jury on the

---

[7] Hawaii is a comparative negligence state. Section 663-31 of the Hawaii Revised Statutes (1976) provides in relevant part: "Contributory negligence shall not bar recovery . . . if such negligence was not greater than . . . the aggregate negligence of such persons against whom recovery is sought[.]"

[8] Plaintiffs attempted to raise two other issues. One involved one of the findings of fact in *Crawford v. Lang,* First Circuit Civil No. 53821, Appeal No. 8353, and the other involved one of the conclusions of law in that case. For obvious reasons, we will not address those issues in this case.

[9] *See State v. Smith,* 59 Haw. 565, 583 P.2d 347 (1978); *Sherry v. Asing,* 56 Haw. 135, 531 P.2d 648 (1975).

evidence before it, and that expert testimony in this area is not necessary or appropriate.

[PLAINTIFFS' COUNSEL]: Your Honor, he's also going to testify as to alternate designs, what other aircraft have as to alternate designs, possible improvements on this aircraft, and things that very definitely are not within the general knowledge. And he's also going to give some technical reason for why confusion exists and why the alternate designs do not result in the same type of confusion.

THE COURT: Court's going to sustain the objection.

———————

[DEFENDANT'S COUNSEL]: The other thing is, Judge, nothing that they have said changes our views so far as the jury's ability to decide whether there was a possible confusion or whether that made it bad or good.

Now, if he wants to testify as to the technology that was in existence at the time this plane was built in 1960, that's a different thing. We have no objection to that. He can testify that other planes at that time were built differently, but I don't think it's fair for him to rely on modern day technology to go back and criticize a 1960 airplane.

THE COURT: The Court agrees with you. You've made your offer of proof. It will be sustained. Objection is sustained.

[PLAINTIFFS' COUNSEL]: All right, sir. What I don't understand is what areas —

THE COURT: You are not going to permit him to testify as to what you were going to have him testify to as to the cause of the accident.

[PLAINTIFFS' COUNSEL]: As to the cause. Can we go into the question of technology of the fuel system?

THE COURT: At the time when this Beechcraft was manufactured, yes. Not after that.

Rule 702, Hawaii Rules of Evidence, Chapter 626, Hawaii Revised Statutes, allows experts to give opinions if their "knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue[.]" We agree with the lower court that the jury did not need any expertise to decide if and

why Mr. Lang was confused and the reasonableness of his confusion.

Moreover, according to the record, the expert was not precluded from testifying about the M35's fuel system or about possible problems when dealing with it. As a matter of fact, he later testified:

> Q Do you have an opinion regarding the design of the M-35 Bonanza fuel system as compared to similar light airplane [sic] of that era?
>
> A Yes, I do.
>
> Q What is that opinion?
>
> A It's more complicated than the average airplane that was built at that time.

Thereafter, he testified in depth as to why he thought so.

2. Plaintiffs contend that the trial court erred in directing verdict against them in Beech's favor. We disagree.

The test of the validity of a directed verdict is whether the evidence is such that, after giving to plaintiffs' evidence all value to which it is legally entitled, and indulging every legitimate inference which may be drawn from the evidence in plaintiffs' favor, it can be said that there is no evidence to support a jury verdict in plaintiffs' favor.[10] *Cafarella v. Char*, 1 Haw. App. 142, 615 P.2d 763 (1980).

Plaintiffs' primary complaint against Beech is that the aircraft was equipped with only two fuel tank gauges but it had four fuel tanks and an independent FTSV.[11] Consequently, it was possible for the "main fuel" tanks' gauge to be indicating the amount of fuel in the left main fuel tank when the engine was actually being fueled by the right main fuel tank. According to plaintiffs, this system was so confusing that the M35 is, in the language of *Stewart v. Budget Rent-A-Car Corp.,* 52 Haw.

---

[10] To be sustained by an appellate court, the verdict of a jury need only be supported by substantial evidence, *Harkins v. Ikeda,* 57 Haw. 378, 557 P.2d 788 (1976). Substantial evidence is credible evidence which is of sufficient quantity and probative value to justify a reasonable person in reaching a conclusion. *In Re Charley's Tour & Transp., Inc.,* 55 Haw. 463, 522 P.2d 1272 (1974).

[11] According to the record, DC-3s use one fuel gauge to monitor several fuel tanks.

71, 75, 470 P.2d 240, 243 (1970), "a defective product which is dangerous to the user or consumer . . ." because it did not meet his reasonable expectations as to its safety. *Ontai v. Straub Clinic and Hospital, Inc.,* 66 Haw. 237, 659 P.2d 734 (1983).

Plaintiffs also claim that the M35 is a dangerous and defective product due to the lack of a low fuel quantity warning light, the tendency of the boost pump to flood the engine, the time to restart the engine after engine failure, the position of the FTSV in the cockpit, and the fact that in or about 1970 one of Beech's employees experienced engine failure in flight because he was using the auxiliary tanks and they ran dry.[12] We disagree.

Upon review of the evidence, we agree with the lower court judge that there is no evidence to support any findings other than that:

1. The design of the M35 may be more complicated and less convenient than other aircrafts but it is not tortiously defective and dangerous. Knowing how much fuel is in a particular tank and where the FTSV is and how to operate it is not information that a pilot should need to determine in an instant.

2. Mr. Lang took off on a functionally empty tank, and when the engine stopped for lack of fuel, he could and should have but did not move the FTSV so that it pointed to either of the next two positions. The causes of the M35's crash were that Mr. Lang failed to do what he was supposed to do before he took off and after the engine stopped, and not the alleged confusing design or the other alleged defects.

Affirmed.

*Gerald C. Sterns,* California (with him on the briefs *Emund L. Lee, Jr.,* Honolulu; *Robert L. Ingram* and *Craig Dykman,* Honolulu) for appellants.

*Richard E. Stifel* (with him on the briefs *Lawrence L. Tong; Goodsill, Anderson & Quinn*) for appellee.

---

[12] The employee testified:

The auxiliary returns to the left main, and I was planning 13 gallons an hour, approximately, out of the auxiliary tank. And the return fuel was going — so that would actually say you are using about 23 gallons. So the tank ran out before I expected. It wasn't really a problem. I just had to switch tanks.