Loyda CASTRO; Raul Castro, Plaintiffs–Appellants,

v.

QVC NETWORK, INC.; U.S.A. T–FAL Corp., Defendants–Appellees.

Docket No. 96–7908.

United States Court of Appeals, Second Circuit.

Argued Sept. 24, 1997.

Decided March 5, 1998.

Joel J. Ziegler, Greshin, Ziegler & Pruzansky, Smithtown, NY, for Plaintiffs–Appellants.

Barry J. Kushel, Gallacher, Kushel & Horvat, Riverhead, NY (Robert F. Saunderson, of counsel), for Defendant–Appellant QVC Network, Inc.

David M. Reilly, Croutier & Ryan, Garden City, NY, for Defendant–Appellant U.S.A. T–Fal Corp.

Before: MESKILL, CALABRESI, Circuit Judges, BRIEANT,* District Judge.

CALABRESI, Circuit Judge:

In this diversity products liability action, plaintiffs-appellants alleged, in separate causes of action for strict liability and for breach of warranty, that defendants-appellees manufactured and sold a defective roasting pan that injured one of the appellants. The United States District Court for the Eastern District of New York (Leonard D. Wexler, *Judge*) rejected appellants' request to charge the jury separately on each cause of action and, instead, instructed the jury only on the strict liability charge. The jury found for appellees and the court denied appellants' motion for a new trial. This appeal followed. We hold that, under New York law, the jury should have been instructed separately on each charge, and, accordingly, reverse and remand for a new trial on the breach of warranty claim.

## I. BACKGROUND

In early November 1993, appellee QVC Network, Inc. ("QVC"), operator of a cable television home-shopping channel, advertised, as part of a one-day Thanksgiving promotion, the "T–Fal Jumbo Resistal Roaster." The roaster, manufactured by U.S.A. T–Fal Corp. ("T–Fal"), was described as suitable for, among other things, cooking a twenty-five pound turkey.[1] Appellant Loyda Castro bought the roasting pan by mail and used it to prepare a twenty-pound turkey on Thanksgiving Day, 1993.

Mrs. Castro was injured when she attempted to remove the turkey and roasting pan from the oven. Using insulated mittens, she gripped the pan's handles with the first two fingers on each hand (the maximum grip allowed by the small size of the handles) and took the pan out of the oven. As the turkey tipped toward her, she lost control of the pan, spilling the hot drippings and fat that had accumulated in it during the cooking and basting process. As a result, she suffered

---

* The Honorable Charles L. Brieant, District Judge of the United States District Court for the Southern District of New York, sitting by designation.

1. At the time that QVC and T–Fal agreed to conduct the Thanksgiving promotion, T–Fal did not have in its product line a pan large enough to roast a turkey. T–Fal therefore asked its parent company, located in France, to provide a suitable roasting pan as soon as possible. The parent provided a pan (designed originally without handles and for other purposes). To this pan two small handles were added so that it could be used to roast a turkey. T–Fal shipped the pan to QVC in time for the early November campaign.

second and third degree burns to her foot and ankle, which, over time, has led to scarring, intermittent paresthesia, and ankle swelling.

It is uncontested that in their complaint appellants alleged that the pan was defective and that its defects gave rise to separate causes. of action for strict liability and for breach of warranty. Moreover, in the pre-charge conference, appellants' counsel repeatedly requested separate jury charges on strict liability and for breach of warranty. The district court, nevertheless, denied the request for a separate charge on breach of warranty. Judge Wexler stated that "you can't collect twice for the same thing," and deemed the warranty charge unnecessary and "duplicative." The court, therefore, only gave the jury the New York pattern strict products liability charge.

The jury returned a verdict for appellees QVC and T–Fal. Judgment was entered on September 14, 1995. Appellants subsequently moved, pursuant to Federal Rule of Civil Procedure 59, that the jury verdict be set aside and a new trial be ordered for various reasons including that the court had failed to charge the jury on appellants' claim for breach of warranty. By order dated July 10, 1996, the district court denied appellants' Rule 59 motion, reasoning that the breach of warranty and strict products liability claims were "virtually the same." This appeal followed.

**2.** *See generally* W. Page Keeton, *The Meaning of Defect in Products Liability Law*, 45 Mo. L.Rev. 579 (1980); W. Page Keeton, *Product Liability and the Meaning of Defect*, 5 St. Mary's L.J. 30 (1973); Guido Calabresi & Jon T. Hirschoff, *Toward a Test for Strict Liability in Torts*, 81 Yale L.J. 1055 (1972).

**3.** According to the New York Court of Appeals, the risk/utility calculus, which requires "a weighing of the product's benefits against its risks," *Denny v. Ford Motor Co.*, 87 N.Y.2d 248, 257, 639 N.Y.S.2d 250, 662 N.E.2d 730, 735 (1995), is " 'functionally synonymous' " with traditional negligence analysis, *id.* at 258, 639 N.Y.S.2d 250, 662 N.E.2d 730 (citation omitted). Despite the fact that there are some significant differences, the risk/utility calculus is in many ways similar to the Learned Hand negligence test. *See Liriano v. Hobart Corp.*, 132 F.3d 124, 131 n. 12 (2d Cir. 1998) (explaining that the most important difference between the two tests is that traditional negligence strikes its cost/benefit balance on the

II. DISCUSSION

 We review a district court's denial of a new-trial motion for abuse of discretion. *See Luciano v. Olsten Corp.*, 110 F.3d 210, 217 (2d Cir.1997). A failure to give a required charge to the jury, if not harmless, constitutes abuse of discretion. *See id.* at 218 ("[A] jury charge is erroneous if the instruction ... does not adequately inform the jury of the law."); *Anderson v. Branen,* 17 F.3d 552, 556 (2d Cir.1994) ("An erroneous instruction, unless harmless, requires a new trial.").

### A. Two Definitions of "Defective" Product Design

Products liability law has long been bedeviled by the search for an appropriate definition of "defective" product design.[2] Over the years, both in the cases and in the literature, two approaches have come to predominate. The first is the risk/utility theory, which focuses on whether the benefits of a product outweigh the dangers of its design.[3] The second is the consumer expectations theory, which focuses on what a buyer/user of a product would properly expect that the product would be suited for.[4]

Not all states accept both of these approaches. Some define design defect only according to the risk/utility approach. *See,*

basis of what is known or ought to be known at the time the defendant acted, while the risk/utility test takes into account all relevant information that has become available subsequent to the defendant's actions).

**4.** The New York Court of Appeals explains that "the UCC's concept of a 'defective' product requires an inquiry only into whether the product in question was 'fit for the ordinary purposes for which such goods are used.' " *Denny,* 87 N.Y.2d at 258, 639 N.Y.S.2d 250, 662 N.E.2d at 736 (quoting U.C.C. § 2–314(2)(c)). Thus, the breach of warranty cause of action "is one involving true 'strict' liability, since recovery may be had upon a showing that the product was not minimally safe for its expected purpose." *Id.* at 259, 639 N.Y.S.2d 250, 662 N.E.2d 730. Some scholars have characterized this inquiry as centering on whether the manufacturer or the user is in a better position to decide about safety. *See* Calabresi & Hirschoff, *supra* note 2, at 1060.

*e.g., Armentrout v. FMC Corp.,* 842 P.2d 175, 183 (Colo.1992); *Radiation Tech., Inc. v. Ware Constr. Co.,* 445 So.2d 329, 331 (Fla. 1983); *Thibault v. Sears, Roebuck & Co.,* 118 N.H. 802, 395 A.2d 843, 846 (1978). Others define design defect solely in terms of the consumer expectations theory. *See, e.g., Rojas v. Lindsay Mfg. Co.,* 108 Idaho 590, 701 P.2d 210, 212 (1985); *Ritter v. Narragansett Elec. Co.,* 109 R.I. 176, 283 A.2d 255, 263 (1971); *Vincer v. Esther Williams All–Aluminum Swimming Pool Co.,* 69 Wis.2d 326, 230 N.W.2d 794, 798 (1975).[5]

One of the first states to accept both approaches was California, which in *Barker v. Lull Engineering Co.,* 20 Cal.3d 413, 143 Cal.Rptr. 225, 573 P.2d 443 (1978), held that "a product may be found defective in design, so as to subject a manufacturer to strict liability for resulting injuries, under either of two alternative tests"—consumer expectations and risk/utility. *Id.* at 430–32, 143 Cal. Rptr. at 237, 573 P.2d at 455.[6] Several states have followed suit and have adopted both theories. *See Caterpillar Tractor Co. v. Beck,* 593 P.2d 871, 884 (Alaska 1979); *Dart v. Wiebe Mfg., Inc.,* 147 Ariz. 242, 709 P.2d 876, 879–80 (1985); *Ontai v. Straub Clinic & Hosp., Inc.,* 66 Haw. 237, 659 P.2d 734, 739–40 (1983); *Lamkin v. Towner,* 138 Ill.2d 510, 150 Ill.Dec. 562, 563 N.E.2d 449, 457 (1990); *Knitz v. Minster Mach. Co.,* 69 Ohio St.2d 460, 432 N.E.2d 814, 818 (1982).

Prior to the recent case of *Denny v. Ford Motor Co.,* 87 N.Y.2d 248, 639 N.Y.S.2d 250, 662 N.E.2d 730 (1995), it was not clear whether New York recognized both tests. In *Denny,* the plaintiff was injured when her Ford Bronco II sports utility vehicle rolled over when she slammed on the brakes to avoid hitting a deer in the vehicle's path. *See Denny v. Ford Motor Co.,* 42 F.3d 106, 108 (2d Cir.1994), *certifying questions to Denny,* 87 N.Y.2d 248, 639 N.Y.S.2d 250, 662 N.E.2d 730. The plaintiff asserted claims for strict products liability and for breach of implied warranty, and the district judge—over the objection of defendant Ford—submitted both causes of action to the jury. *See id.* The jury ruled in favor of Ford on the strict liability claim, but found for the plaintiff on the implied warranty claim. *See id.* at 109–10. On appeal, Ford argued that the jury's verdicts on the strict products liability claim and the breach of warranty claim were inconsistent because the causes of action were identical. *See id.* at 107.

This court certified the *Denny* case to the New York Court of Appeals to answer the following questions: (1) "whether, under New York law, the strict products liability and implied warranty claims are identical"; and (2) "whether, if the claims are different, the strict products liability claim is broader than the implied warranty claim and encompasses the latter." *Id.* at 111–12.

■ In response to the certified questions, the Court of Appeals held that in a products liability case a cause of action for strict liability is not identical to a claim for breach of warranty. *See Denny,* 87 N.Y.2d at 251, 639 N.Y.S.2d 250, 662 N.E.2d at 731.[7]

---

**5.** Still others apply a "modified consumer expectations test" that incorporates risk/utility factors into the consumer expectations analysis. *See, e.g., Potter v. Chicago Pneumatic Tool Co.,* 241 Conn. 199, 694 A.2d 1319, 1333 (1997); *Seattle–First Nat'l Bank v. Tabert,* 86 Wash.2d 145, 542 P.2d 774, 779 (1975).

**6.** The court stated:

First, a product may be found defective in design if the plaintiff establishes that the product failed to perform as safely as an ordinary customer would expect when used in an intended or reasonably foreseeable manner. Second, a product may alternatively be found defective in design if the plaintiff demonstrates that the product's design proximately caused his injury and the defendant fails to establish, in light of the relevant factors, that, on balance, the benefits of the challenged design outweigh the risk of danger inherent in such design.

*Barker,* 143 Cal.Rptr. 225, 573 P.2d at 455–56. Placement of the burden of proving the product's risks and utility on the manufacturer is not, however, a necessary part of the risk/utility test. *See, e.g., Dart v. Wiebe Mfg., Inc.,* 147 Ariz. 242, 709 P.2d 876, 879 (1985).

**7.** Judge Titone, writing for the majority, noted that "[t]he continued vitality of the warranty approach is evidenced by its retention and expansion in New York's versions of the Uniform Commercial Code (U.C.C. 2–314[2][c]; 2–318)." *Denny,* 87 N.Y.2d at 256, 639 N.Y.S.2d 250, 662 N.E.2d at 734.

New York's Commercial Code § 2–314 ("Implied Warranty:. Merchantability; Usage of Trade") states that "a warranty that the goods

Moreover, the court held that a strict liability claim is not per se broader than a breach of warranty claim such that the former encompasses the latter. *See id.* Thus, while claims of strict products liability and breach of warranty are often used interchangeably, under New York law the two causes of action are definitively different. The imposition of strict liability for an alleged design "defect" is determined by a risk-utility standard, *see Voss v. Black & Decker Mfg. Co.,* 59 N.Y.2d 102, 108, 463 N.Y.S.2d 398, 450 N.E.2d 204, 208 (1983). The notion of "defect" in a U.C.C.-based breach of warranty claim focuses, instead, on consumer expectations. *See Denny,* 87 N.Y.2d at 258–59, 639 N.Y.S.2d 250, 662 N.E.2d at 736.

### B. When Should a Jury be Charged on Both Strict Liability and Warranty Causes of Action?

■ Since *Denny,* then, it has been settled that the risk/utility and consumer expectations theories of design defect can, in New York, be the bases of distinct causes of action: one for strict products liability and one for breach of warranty. This fact, however, does not settle the question of when a jury must be charged separately on each cause of action and when, instead, the two causes are, on the facts of the specific case, sufficiently similar to each other so that one charge to the jury is enough.

While eminent jurists have at times been troubled by this issue,[8] the New York Court of Appeals in *Denny* was quite clear on when the two causes of action might meld and when, instead, they are to be treated as separate. It did this by adding its own twist to the distinction—namely, what can aptly be called the "dual purpose" requirement. *See Denny,* 87 N.Y.2d at 263, 639 N.Y.S.2d 250, 662 N.E.2d at 738–39. Thus in *Denny,* the Court of Appeals pointed out that the fact that a product's overall benefits might outweigh its overall risks does not preclude the possibility that consumers may have been misled into using the product in a context in which it was dangerously unsafe. *See id.* at 262–63, 639 N.Y.S.2d 250, 662 N.E.2d 730. And this, the New York court emphasized, could be so even though the benefits in other uses might make the product sufficiently reasonable so that it passed the risk/utility test. *See id.*

In *Denny,* the Ford Bronco II was not designed as a conventional passenger automobile. Instead, it was designed as an off-road, dual purpose vehicle.[9] But in its marketing of the Bronco II, Ford stressed its suitability for commuting and for suburban and city driving. *See id.* Under the circumstances, the Court of Appeals explained that

---

shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind.... Goods to be merchantable must be ... fit for the ordinary purposes for which such goods are used...." N.Y. U.C.C. § 2–314 (McKinney 1993). Section 318 ("Third Party Beneficiaries of Warranties Express or Implied") provides that "[a] seller's warranty whether express or implied extends to any natural person if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of the warranty." *Id.* § 2–318.

8. Thus Justice Traynor in the early and seminal California strict products liability case, *Greenman v. Yuba Power Products,* 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897 (1963), did not make a clear distinction between them. *See id.* at 64, 27 Cal.Rptr. at 701, 377 P.2d at 901 ("[I]t should not be controlling [for purposes of establishing a manufacturer's liability] whether plaintiff selected the [product] because of the statements in the brochure, or because of the [product's] own appearance of excellence that belied the defect

lurking beneath the surface, or because he merely assumed that it would safely do the jobs it was built to do."). And likewise, Judge Eschbach in *Sills v. Massey–Ferguson, Inc.,* 296 F.Supp. 776 (N.D.Ind.1969), stated that although they represented different causes of action, in the case before him, he could not distinguish between them, and then added that "[w]hile this court is unwilling to hold that there is *never* a significant difference between the two theories, it is plain that the outcome of the vast majority of cases is not affected by this fine legal distinction." *Id.* at 779.

9. Indeed, as Ford argued, the design features that appellant complained of—high center of gravity, narrow track width, short wheel base, and a specially tailored suspension system—were important to preserve the vehicle's utility for off-road use. *See Denny,* 87 N.Y.2d at 262, 639 N.Y.S.2d 250, 662 N.E.2d at 738. But, it was these same design features that made the vehicle susceptible to rollover accidents during evasive maneuvers on paved roads. *See id.* at 263, 639 N.Y.S.2d 250, 662 N.E.2d 730.

a rational factfinder could conclude that the Bronco's utility as an off-road vehicle outweighed the risk of injury resulting from roll-over accidents (thus passing the risk/utility test), but at the same time find that the vehicle was not safe for the "ordinary purpose" of daily driving for which it was also marketed and sold (thus flunking the consumer expectations test). *See id.*

That is precisely the situation before us. The jury had before it evidence that the product was designed, marketed, and sold as a multiple-use product. The pan was originally manufactured and sold in France as an all-purpose cooking dish without handles. And at trial, the jury saw a videotape of a QVC representative demonstrating to the television audience that the pan, in addition to serving as a suitable roaster for a twenty-five pound turkey, could also be used to cook casseroles, cutlets, cookies, and other low-volume foods.[10] The court charged the jury that "[a] product is defective if it is not reasonably safe[,] [t]hat is, if the product is so likely to be harmful to persons that a reasonable person who had actual knowledge of its potential for producing injury would conclude that it should not have been marketed in that condition." And, so instructed, the jury presumably found that the pan, because it had many advantages in a variety of uses, did not fail the risk/utility test.

But it was also the case that the pan was advertised as suitable for a particular use—cooking a twenty-five pound turkey. Indeed,

T–Fal added handles to the pan in order to fill QVC's request for a roasting pan that it could use in its Thanksgiving promotion. The product was, therefore, sold as appropriately used for roasting a twenty-five pound turkey. And it was in that use that allegedly the product failed and injured the appellant.

In such circumstances, New York law is clear that a general charge on strict products liability based on the risk/utility approach does not suffice. The jury could have found that the roasting pan's overall utility for cooking low-volume foods outweighed the risk of injury when cooking heavier foods, but that the product was nonetheless unsafe for the purpose for which it was marketed and sold—roasting a twenty-five pound turkey—and, as such, was defective under the consumer expectations test. That being so, the appellants were entitled to a separate breach of warranty charge.[11]

III. CONCLUSION

In light of the evidence presented by appellants of the multi-purpose nature of the product at issue, the district court, applying New York law, should have granted appellants' request for a separate jury charge on the breach of warranty claim in addition to the charge on the strict liability claim.[12] Accordingly, we reverse the order of the district court denying the motion for a new trial, and remand the case for a new trial on the

**10.** Appellants also introduced into evidence a "sell sheet" prepared by T-Fal, which described for the QVC salespersons the uses and characteristics of the product, including not only cooking a twenty-five pound turkey, but also an extensive list of several low-volume foods, such as cake, lasagna, and stuffed potatoes. While the "sell-sheet" was an internal document, and therefore, could not have influenced consumer expectations, it does shed light on the meaning of the videotaped commercial.

**11.** Appellees argue that "[t]he roaster had only a single purpose which was to be a vessel for cooking." But that misses the point of the dual purpose test. Indeed, the same argument could have been made in the *Denny* case: that the Ford Bronco II had a single purpose, namely driving. What characterizes both of these cases, however, is that there was evidence before the jury of the "dual purposes" to which the products could be

put. As the Court of Appeals stated in *Denny,* it is "the nature of the proof and the way in which the fact issues [are] litigated [that] demonstrate[ ] how the two causes of action can diverge." *Denny,* 87 N.Y.2d at 262, 639 N.Y.S.2d 250, 662 N.E.2d at 738. In the instant case, given the evidence before the jury of the pan's dual purposes, the failure to charge the jury on breach of warranty could not be harmless error.

**12.** Appellants further claim that the question presented to the jury in the verdict sheet—"Was Defendants' product defective?"—erroneously misled the jury because it did not specifically refer to defective "design." Appellants contend that a proper question would have permitted the jury to consider the breach of warranty issue. Because we hold that the court should have instructed the jury separately on the warranty claim, this is no longer a concern.

breach of warranty claim, consistent with this opinion.