949 P.2d 1004

Anna TORRES, individually and as Special Administratrix of the Estate of Fernando Torres, Deceased, and Carol Torres, Plaintiffs–Appellants,

v.

NORTHWEST ENGINEERING COMPANY, John Does 1–10, Jane Does 1–10, Doe Partnerships 1–10, Roe Non–Profit Organizations 1–10, and Roe Governmental Entities 1–10, Defendants–Appellees.

No. 15953.

Intermediate Court of Appeals of Hawaiʻi.

Nov. 25, 1997.

Reconsideration Denied Dec. 22, 1997.

As Amended Jan. 28, 1998.

Certiorari Denied Jan. 30, 1998.

Herbert R. Takahashi, Stanford H. Masui, and Danny J. Vasconcellos (Takahashi & Masui, of counsel), Honolulu, for plaintiffs-appellants.

Arthur F. Roeca and Keith K. Hiraoka (Roeca, Louie & Hiraoka, of counsel), Honolulu, for defendants-appellees.

Before BURNS, C.J., and WATANABE and ACOBA, JJ.

WATANABE, Judge.

This lawsuit arises from an industrial accident in which a crane manufactured and sold by Defendant–Appellee Northwest Engineering Company (Northwest) tipped over and crushed its operator, Fernando Torres (Torres). Torres subsequently died from injuries he sustained in the accident.

Plaintiff–Appellant Anna Torres (Anna), the widow of Torres, individually and as Special Administratrix of the Estate of Fernando Torres, and Plaintiff–Appellant Carol Torres (Carol), the adult dependent daughter of Torres, (collectively, Plaintiffs) appeal from the following orders and judgment entered by the Second Circuit Court (the circuit court): (1) the January 21, 1992 Order Granting in Part Northwest's Motion for Judgment Notwithstanding the Verdict (JNOV) or, in the Alternative, for New Trial, Amendment of Judgment, Relief from Judgment and Remittitur; (2) the January 22, 1992 Order Denying Plaintiffs' Motion for Partial Judgment Notwithstanding the Verdict (PJNOV); (3) the December 18, 1991 Order Granting Northwest's Motion for Directed Verdict; and (4) the January 21, 1992 Judgment, entered in Northwest's favor as to all claims asserted by Plaintiffs.

We conclude that (A) the circuit court improperly granted JNOV as to Plaintiffs' claim for breach of express warranty, (B) pure comparative fault principles should be applied to reduce any recovery by Plaintiffs for breach of express warranty, (C) the circuit court improperly directed verdict for Northwest as to Plaintiffs' claim that Northwest breached an implied warranty of merchantability, and (D) wrongful death and negligent infliction of emotional distress damages are derivative in nature and consequently, Plaintiffs cannot recover such damages unless Torres had a viable cause of action.

## BACKGROUND

At about 8:15 on the morning of July 2, 1987, Torres, an experienced crane operator, was harvesting sugarcane for his employer, Wailuku Agribusiness Company (Wailuku), in a field located near the Wailuku Heights Subdivision on the island of Maui. According to Joe Azuara (Azuara), an eyewitness to the accident, it had rained that day, creating wet ground conditions in the field where the harvesting was taking place. Torres's job as crane operator was to grab a load of sugarcane from the field and unload that sugarcane into a truck driven by Azuara. At the time of the accident, the crane that Torres was operating was on a 12.9 degree (12.9°) downhill slope, with the crane's tracks pointed down the slope. Azuara testified at trial that prior to the accident, Torres had already dumped two loads of sugarcane into Azuara's truck. When Torres went for his third "grab" of sugarcane, the back of the crane tipped off the ground about two or three feet. Before the crane could settle back down, Torres rotated the crane's boom, which was loaded with cane, towards the truck, then dropped the load into the bed of the truck. Almost immediately, the crane swung away from the truck and began to topple over. Azuara saw Torres fall out of the crane's cab, and the crane landing on Torres and pinning him to the ground. Torres was rushed to the hospital, where he died from multiple injuries sustained in the accident.

It is undisputed that the crane that Torres was operating was a Model 41 special cane-loader crawler-type crane manufactured and sold by Northwest and designated by Wailuku as Crane C204. Crane C204 weighed sixteen tons and was outfitted with a forty-five (45)-foot boom. It also had a grapple apparatus weighing about 3,000 pounds, which was capable of grabbing between one to two tons of sugarcane per grab. The crane had been purchased by Wailuku in November 1972 and delivered to Wailuku by Northwest in April 1973. According to the purchase order and shipping documents (contract documents) for Crane C204, the crane was to be equipped with thirty (30)-inch-wide steel treads.[1] However, after the accident occurred, it was discovered that the treads were only twenty-four (24) inches wide. Since the undisputed testimony of Wailuku's mechanics was that the treads for Crane C204 had never been replaced while Wailuku possessed the crane, it is clear from the record that Northwest supplied Wailuku with a crane that did not conform to the contract documents.

## PROCEDURAL HISTORY

On May 27, 1988, Plaintiffs filed this lawsuit against Northwest, seeking compensatory and punitive damages for negligence, strict products liability, breach of express and implied warranties, wrongful death, and intentional and negligent infliction of emotional distress (NIED). A seven-day jury trial commenced on November 4, 1991.

Plaintiffs' first witness was David Lai (Lai), a retired Wailuku crane operator who had operated heavy equipment for Wailuku for nearly forty-six (46) years and had provided "on-the-job" training to Torres when Torres was first hired by Wailuku. Lai testified that no formal training was provided to Wailuku crane operators and training was instead given "on-the-job." Thus, Lai explained, all Wailuku crane operators handled the cranes basically the same way. Further-

more, none of the operators were taught what to do if a crane were to tip while operating it. Lai did acknowledge that he knew that whenever the crane began to tip, he had to "be sure to check [him]self and go back down again." Lai added, however, that sometimes crane operators didn't realize that their crane was tipping since they had their minds on the "grab at all times," which was the most dangerous part of their job. Moreover, no one at Wailuku had ever cautioned operators not to operate the crane while it was tipped.

When questioned about how he understood the accident to have occurred, Lai testified that the size of the treads had an effect on operation of the crane. Specifically, Lai explained, the treads were twenty-four (24) inches wide when their width should have been thirty (30) to thirty-six (36) inches wide. The defense objected to Lai's statement, but the circuit court overruled the objection, based on Lai's forty years of experience as a crane operator.

Dennis Palmer Martin (Martin), Plaintiffs' expert witness regarding heavy equipment mechanical engineering, testified as to his opinion regarding the cause of Torres's accident. Martin explained that sugarcane is initially burned, then pushed into a wind row with rakes. A crane then comes along and pulls "the cane out of the wind row and out of the tangled up mess of cane." In order to get the sugarcane to break loose, the crane operator would "have to tip the crane up a bit in order to get a little more pull and pull it out of the tangle of the wind row ... to maximize the amount of cane that they are getting each time."

Martin's understanding was that on the day of the accident, Torres was harvesting sugarcane on a slope that appeared to be "a little bit wet." Because the moisture had caused the ground to soften, the crane "would tend to sink down into the ground." When Torres grabbed a load of cane, his crane tipped up about two to three feet at

---

1. Throughout the trial, witnesses often referred to the crane's "treads" as "tracks." Dennis Palmer Martin, a mechanical engineer who testified as an expert witness for Plaintiffs–Appellants Anna Torres (Anna) and Carol Torres (Carol) (collectively, Plaintiffs), explained that the crane's treads are also called "track shoes" or "tracks." For consistency purposes, we have used the word "treads" throughout this opinion.

the back treads, then started to rotate, putting even more pressure onto the crane and planting it further into the ground. Realizing he was in trouble, Torres dumped the load into the truck and then rotated the crane out and away from the truck. Torres then fell out of the crane's door, landing under the crane as the crane fell over and crushed him. Considering the facts, Martin opined "that burying wouldn't have been nearly so bad if there'd been wider treads on [the crane]. For instance, if this [crane] had 36[-]inch treads instead of the 24 inches, the treads would have only pushed down into the ground one half as much." Thus, Martin concluded that

> [t]he accident would have would have [sic] been less likely to have happened as the crane is tipped up. It wouldn't be driven nearly so deeply in the ground. It would tend to stay on the surface better.

> If it were in a very, very critical zone here where it doesn't take much to have the crane go one way or the other. This crane didn't tip over by very much. The crane almost went back the other way because it took so long to go over. Had it gone over real quick, you'd have known that it wasn't balanced very well, but because it took so long for him to rotate clear over there, dump his load and come all the way back before it went over indicates that the crane was almost—was balanced, and if it had those treads, it probably would have stayed up a little higher, wouldn't have sunk in the ground and there's a strong likelihood that it would have gone right back down and we'd have had no accident.

Martin also looked over the contract documents for Crane C-204 and noted that they specified a crane equipped with 30-inch-wide treads. Additionally, Martin interpreted Northwest's product literature to advertise Northwest's cranes as being suitable for soft ground conditions.

At the conclusion of the presentation of Plaintiffs' case, Northwest moved for a directed verdict on all claims, including Plaintiffs' claim for punitive damages. With regard to Northwest's motion for a directed verdict on the claim of breach of implied warranty of merchantability (IWM), Northwest argued that Wailuku's C204 crane was fit for the ordinary purpose for which goods of that kind are used. Northwest reminded the court that Wailuku had purchased the crane in 1973 for the purpose of sugarcane loading, used the crane for that purpose without any problems for fourteen years, and continued to use the crane, without modification, even after Torres's accident occurred.

Northwest then argued for a directed verdict on the issue of implied warranty of fitness for a particular purpose (IWF). Northwest asserted that Plaintiffs were required to prove two requirements in order to establish an IWF: (1) that the seller knew of the particular purpose for which the goods are being requested by the buyer; and (2) the buyer actually relied on the seller's expertise. Northwest contended that in light of the evidence introduced at trial, Plaintiffs had failed to show that Wailuku relied on Northwest's expertise during the course of negotiations, especially since C204 was the third crane purchased by Wailuku from Northwest.

After considering the arguments, the circuit court found that there was no evidence for the jury to infer a breach of the IWM or IWF or that Plaintiffs were entitled to punitive damages. Accordingly, the court granted Northwest's motion for directed verdict as to these claims. In all other respects, the court denied Northwest's motion.

Subsequently, Northwest commenced the presentation of its case. Northwest offered the testimony of Henry Hall (Hall), a Northwest mechanical engineer, as an expert witness in construction equipment mechanical engineering. Hall testified that a total of sixty-four (64) Northwest Model 41 cranes have been sold over the course of forty-two (42) years in Hawai'i and of this total, nineteen (19) were outfitted with 24-inch-wide treads, while forty-five (45) were outfitted with 30-inch-wide treads. Hall stated that none of the cranes used in Hawai'i for sugarcane loading were equipped with 36-inch-wide treads. Hall opined that 30-inch-wide treads would not have prevented the accident

and 24–inch–wide treads did not contribute to it, since a crane's balance is not affected by the size of the crane's treads. Hall explained that the width of the treads does not affect the stability of the machine or its ability to tip because a crane's lifting capacity is determined by the overall mass of the crane, which, in the case of Northwest's Crane C204, was built to tolerate one-third more weight than it was meant to carry. In Hall's opinion, the primary cause of the accident was Torres's attempt to maneuver the load by swinging the crane's boom while the crane was tipped off the ground.

On cross-examination, Hall admitted that there was a six-inch difference between the 24–inch–wide treads on Crane C204 and the 30–inch–wide treads that Northwest was supposed to have shipped, and that 30–inch–wide treads support twenty-five percent (25%) more ground than 24–inch–wide treads. Hall explained that a narrower tread will sit lower in the ground than a wider tread. According to Hall, the following factors contributed to the overturning of the crane: the slope of the hill; the size and weight of the load in combination with the tipping up of the end of the crane, and the soft ground conditions "in the end particularly." Additionally, on redirect examination, Hall testified that the tread's ability to support more ground area had no bearing on the cause of the accident since tread width only prevents the crane from sinking while travelling and does not affect how much the crane is able to lift.

At the close of Northwest's case, Northwest moved for a directed verdict on the breach of express warranty cause of action. Recalling the evidence presented, including the fact that the purchase order for Crane C204 had specified 30–inch–wide treads when only 24–inch–wide treads were delivered, the circuit court determined that the jury had

sufficient evidence to infer that if Crane C204's treads had been wider, the crane would have been more stable. The circuit court denied Northwest's motion.

Plaintiffs' negligence, strict products liability,[2] and breach of express warranty claims were thereafter submitted to the jury, along with a special verdict form which included interrogatories pertaining to the issues submitted. In returning its special verdict, the jury responded to the special verdict interrogatories, in relevant part, as follows:

1. Did Defendant Northwest Engineering Company [ (Northwest) ] negligently design the Model 41 crane operated by Fernando Torres [ (Torres) ] on July 2, 1987?

Yes _____ No X

* * *

3. Did ... Northwest ... negligently fail to warn ... Torres of a danger associated with the use of the Model 41crane operated by ... Torres on July 2, 1987 which was not known or obvious?

Yes _____ No X

* * *

5. Did ... Northwest ... negligently fail to include a safety device in the Model 41 crane operated by ... Torres on July 2, 1987?

Yes _____ No X

* * *

7. Regardless of how you answered the previous questions, answer this question: Was the Model 41 crane defective in design at the time it was sold by Northwest ... to Wailuku Sugar Company?

2. Our review of the record indicates that the jury was never given a special verdict interrogatory as to whether Defendant–Appellee Northwest Engineering Company (Northwest) was strictly liable for the damages caused to Decedent Fernando Torres (Torres). The only interrogatory that related to the strict liability claim of Anna and Carol was the following question:

7. Regardless of how you answered the previous questions, answer this question: Was the Model 41 crane defective in design at the time it was sold by Northwest ... to Wailuku Sugar Company?

Yes _____ No _____

Yes _____ No __X__

9. Regardless of how you answered the previous questions, answer this question: Did ... Northwest ... breach an express warranty?

Yes __X__ No _____

10. If your answer to question (9) is "yes", then answer this question: If so, was said breach of express warranty a legal cause of the accident of July 2, 1987?

Yes __X__ No _____

\* \* \*

11. Was ... Torres contributorily negligent?

Yes __X__ No _____

If you answered "yes" to Question No. 11, then answer Question No. 12. If you answered "no" to Question No. 11, skip Question No. 12 and go directly to Question No. 13.

12. Was the negligence of ... Torres a legal cause of the accident of July 2, 1987?

Yes __X__ No _____

13. Without taking into consideration the question of reduction of damages due to the contributory negligence, if any, of ... Torres, what are the Estate of ... Torres' [sic] total damages?

General Damages: $ 350,000.00

Special Damages: $ 115,700.00

Now go on to Question No. 14.

14. What are Anna Torres' [sic] total damages?

General Damages: $ 100,000.00

Special Damages: $ 100,000.00

Now go on to Question No. 15.

15. What are Carol Torres' [sic] total damages?

General Damages: $ 100,000.00

Special Damages: $ 100,000.00

\* \* \*

16. Assuming the combined negligence, if any, of Northwest ... and the contributory negligence of ... Torres to be 100%, what proportion of such combined negligence if [sic] attributable to each of the parties?

[Northwest] 15 %

[Torres] .85 %

Total (must equal 100%) 100 %

The jury's award totalled $865,700.

Northwest later filed a Motion for JNOV or in the Alternative, a Motion For New Trial, Amendment of Judgment, Relief from Judgment and Remittitur (JNOV and/or alternative motion). In response, Plaintiffs filed a PJNOV motion. The circuit court granted Northwest's JNOV and/or alternative motion in part, entering a JNOV order as to Plaintiffs' breach of express warranty claim, and denied Plaintiffs' PJNOV motion. Plaintiffs' award was thereby reduced to zero. Thereafter, the circuit court entered judgment for Northwest as to all claims asserted by Plaintiffs. This appeal followed.

## ISSUES ON APPEAL

Plaintiffs contend that:

(1) the circuit court erred in entering a JNOV order as to Plaintiffs' breach of express warranty claim because taking the evidence in the light most favorable to Plaintiffs and indulging every legitimate inference in favor of Plaintiffs, there is ample evidence to support the jury's verdict that Northwest breached an express warranty and that such breach was a legal cause of the accident of July 2, 1987;

(2) the circuit court should have granted their PJNOV motion because (a) contributory negligence is inapplicable to a breach of express warranty claim and therefore, judgment as to this claim should have been entered for Plaintiffs without reduction for Torres's contributory negligence, and (b) wrongful death and NIED are separate and independent torts and therefore, the damages awarded to Anna and Carol for said

offenses should not have been reduced to zero on account of Torres's contributory negligence; and

(3) the circuit court improperly directed a verdict in Northwest's favor on Plaintiffs' claims of breach of implied warranties.

## STANDARD OF REVIEW

The Hawai'i Supreme Court has stated that denials of directed verdict or JNOV motions are reviewed on appeal *de novo*. *Carr v. Strode*, 79 Hawai'i 475, 486, 904 P.2d 489, 500 (1995). We similarly conclude that the granting of a directed verdict or JNOV motion is to be reviewed *de novo*.

> In deciding a motion for directed verdict or JNOV, the evidence and the inferences which may be fairly drawn therefrom must be considered in the light most favorable to the nonmoving party and either motion may be granted only where there can be but one reasonable conclusion as to the proper judgment. Thus, where there is conflicting evidence, or there is insufficient evidence to make a one-way verdict proper, [JNOV] should not be awarded.

*Lau v. Allied Wholesale, Inc.*, 82 Hawai'i 428, 432–33, 922 P.2d 1041, 1045–46 (App.1996) (quoting *Carr v. Strode*, 79 Hawai'i 475, 486–87, 904 P.2d 489, 500–01 (1995) (quotation marks and brackets omitted)).

## DISCUSSION

I. *The Propriety of the Circuit Court's Order Granting JNOV as to Plaintiffs' Breach of Express Warranty Claim*

In seeking JNOV as to Plaintiffs' breach of express warranty claims, Northwest argued essentially that (1) there was no evidence that an express warranty for Torres's benefit had been created and breached by Northwest; (2) assuming there was evidence of Northwest's creation and breach of an express warranty, no evidence was adduced that Northwest's breach was the *probable*, and not merely the *possible*, cause of the

---

crane accident; (3) as a matter of law, Northwest could not be liable for consequential damages · under Hawai'i Revised Statutes (HRS) § 490:2–715 (1993); and (4) Plaintiffs' breach of express warranty claim was barred by the statute of limitations set forth in HRS § 490:2–725 (1993).

At the close of the January 8, 1992 hearing on Northwest's JNOV and/or alternative motion, the circuit court orally granted Northwest's request for JNOV, stating:

> I don't see that there's any, in reviewing the facts that have been presented to the court since its denial of the motion for directed verdict at the conclusion of the case—that review reflects that there just was not sufficient proof from a[n] expert point of view to link the breach, express breach, to the injuries that were incurred. The mere possibility is really not enough. Possibility has been shown, yes, but that's not enough and I'm going to find . . . there was insufficient proof, therefore, . . . proximate causation has not been adequately demonstrated or proved by the plaintiffs, that they had the burden to do so and . . . grant the motion.

The court did not address the other arguments raised by Northwest in support of its JNOV and/or alternative motion, either orally or in its subsequent written order.

Since we review the propriety of the circuit court's decision to grant JNOV *de novo*, we examine whether, upon review of the evidence and the inferences fairly drawn therefrom, there can be but one reasonable conclusion as to the propriety of the circuit court's JNOV order.

A. *The Existence of an Express Warranty*

■ We first address Northwest's argument that JNOV was properly granted because Plaintiffs failed to produce any evidence of the existence of an express warranty for Torres's benefit.[3]

---

3. During oral arguments, Plaintiffs contended that because Torres was a third-party beneficiary of any express warranty made by Northwest to Wailuku Agribusiness Company (Wailuku), Hawai'i Revised Statutes (HRS) § 490:2–318 (1993)

relieved them of any burden to prove the existence of any warranty between Northwest and Wailuku. We find no merit to this argument.

HRS § 490:2–318 states:

Under the Uniform Commercial Code (UCC),[4] there are three types of express warranties that may be created by a seller. HRS § 490:2–313 (1993), Hawaiʻi's version of UCC 2–313, provides:

**Express warranties by affirmation, promise, description, sample.** (1) Express warranties by the seller are created as follows:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods *and becomes part of the basis of the bargain creates an express warranty* that the goods shall conform to the affirmation or promise.

(b) Any description of the goods *which is made part of the basis of the bargain creates an express warranty* that the goods shall conform to the description.

(c) Any sample or model *which is made part of the basis of the bargain creates an express warranty* that the whole of the goods shall conform to the sample or model.

(2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he [or she] have a specific intention to make a warranty, but *an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.*

(Emphases added.)

Plaintiffs based their claim for breach of express warranty on: (1) Northwest's delivery to Wailuku of a crane that had 24–inch–wide treads, rather than the 30–inch–wide steel treads described in the contract documents; i.e., breach of a description of goods warranty under HRS § 490:2–313(1)(b); and (2) Northwest's "promise," contained in company advertisements and promotional literature (advertisements), that Northwest cranes could perform on soft ground and in all weather conditions; i.e., breach of a performance standards warranty under HRS § 490:2–313(1)(a).

Northwest insists, however, that the existence of an express warranty was not established as a matter of law because (1) Plaintiffs failed to adduce any evidence that Wailuku *relied* on the thirty (30)-inch width of the crane's treads as part of the "basis of its bargain" with Northwest to purchase the Northwest Model 41 crane; and (2) "Plaintiffs presented absolutely no evidence that Wailuku ... even received the Northwest product literature ... upon which their claim for breach of express warranty was based, much less that Wailuku ... specifically considered or relied upon any affirmation of fact or description contained in the documents in deciding to purchase C204."

**Third party beneficiaries of warranties express or implied.** A *seller's warranty* whether express or implied *extends* to any person who may reasonably be expected to use, consume or be affected by the goods and who is injured by breach of the warranty. A seller may not exclude or limit the operation of this section with respect to injury to the person of an individual to whom the warranty extends. (Emphases added).

The comments to the 1962 Official Text of the Uniform Commercial Code (UCC) (Official Comments) regarding UCC 2–318, the UCC provision upon which HRS § 490:2–318 was modeled, state in pertinent part: "The purpose of this section is to give the buyer's family, household and guests the benefit of the *same warranty which the buyer received* in the contract of sale, thereby freeing any such beneficiaries from any technical rules as to 'privity.'" (Emphasis added.)

Based on the underscored language of HRS § 490:2–318 as well as the official comments, it is apparent that a warranty between a buyer and seller must exist before a third-party beneficiary of the buyer may prevail on a claim for breach of express warranty; i.e., the third-party beneficiary's right to sue the seller is derivative of the buyer's right to sue for breach of express warranty. Therefore, in order to state a viable claim against Northwest for breach of express warranty, Plaintiffs were required to show that an express warranty by Northwest to Wailuku was in existence and that Northwest breached said warranty.

4. HRS § 490:2–101 (1993) specifies that "[t]his chapter [490] shall be known and may be cited as Uniform Commercial Code [(UCC)]—Sales."

The arguments of the parties raise an issue which has divided courts across the country—whether, under UCC 2–313, a buyer's *reliance* on a seller's affirmations, promises, descriptions or models (collectively, "seller's statements") is required for an express warranty to arise.

### 1. The Necessity for a Buyer's Reliance on a Seller's Statements

In examining this issue, we note as a historical preface, that under Section 12 of the Uniform Sales Act[5] (USA), the plaintiff in an express warranty case was required to prove that he or she "relied" on a seller's warranty in purchasing the goods. When the UCC was adopted, the language of Section 12 of the USA was substantially retained; however, the USA's "reliance" test was substituted with a new test that required the plaintiff to prove that the seller's statements became "part of the basis of the bargain" between the buyer and seller (basis of the bargain test). UCC 2–313.

The UCC does not define "basis of the bargain," and one scholar has expressed that the term "[m]ost probably . . . is an indefinable concept." 3 M. Foran, *Williston on Sales* § 17–7, at 12 (5th ed.1994). As a result, much litigation has arisen over the years regarding the meaning and proper application of the "basis of the bargain" test.

Some courts which have considered the issue have concluded that reliance by a buyer on a seller's statements remains an essential element of a breach of express warranty claim under the basis of the bargain test. *See, e.g., Speed Fastners, Inc. v. Newsom,* 382 F.2d 395 (10th Cir.1967) (sale of stud fasteners; plaintiff not entitled to recover in breach of express warranty where no evidence that plaintiff's employer relied on statements in seller's pamphlet before purchase); *Global Truck & Equip. Co. v. Palmer Mach. Works, Inc.,* 628 F.Supp. 641 (N.D.Miss.1986) (buyer could not recover for breach of express warranty absent proof that buyer relied on statements prior to or contemporaneously with sale); *Hagenbuch v. Snap–On Tools Corp.,* 339 F.Supp. 676 (D.N.H.1972) (sale of hammer; plaintiff not entitled to recover for breach of express warranty where no evidence that buyer relied on statements in seller's catalogue); *Stamm v. Wilder Travel Trailers,* 44 Ill. App.3d 530, 3 Ill.Dec. 215, 358 N.E.2d 382 (1976) (sale of travel trailer; buyer must prove reliance).

Other courts hold that under the UCC, reliance is no longer required and a buyer may recover on an express warranty even if the buyer never actually received a copy of the warranty and was unaware of its existence. *See, e.g., Lutz Farms v. Asgrow Seed Co.,* 948 F.2d 638 (10th Cir.1991) (seed brochure; reliance not required); *Hawkins Constr. Co. v. Matthews Co.,* 190 Neb. 546, 209 N.W.2d 643 (1973) (sale of scaffolding; express warranty created even if buyer did not rely on statements in seller's brochure); *Winston Indus., Inc. v. Stuyvesant Ins. Co.,* 55 Ala.App. 525, 317 So.2d 493 (Ala.Civ.App.), *cert. denied,* 294 Ala. 775, 317 So.2d 500 (1975) (sale of mobile home; seller's express written warranty was in existence even though purchaser did not physically receive written copy of it and was unaware of its existence).

■ After examining the history of, and the Official Comments to, UCC 2–313, as well as the case law and legal treatises regarding the basis of the bargain test, we agree with those jurisdictions that have concluded that reliance is not an essential element of a breach of express warranty claim under the UCC. We reach this conclusion for several reasons.

First, according to Comment 4 to UCC 2–313, as set forth in the Comments to the 1962 Official Text of the UCC[6] (Official Comments),

(Emphasis added.)

---

5. Section 12 of the Uniform Sales Act provided: Any affirmation of fact or any promise by the seller relating to the goods is an express warranty if the natural tendency of such affirmation or promise is to induce the buyer to purchase the goods, and if the buyer purchases the goods *relying* thereon. . . .

6. As a preface to HRS chapter 490, which codifies the UCC, the legislature acknowledged that "[f]ollowing each section of chapter 490, the Uniform Commercial Code, appear 'Comments to Official Text,' which are the comments pre-

the whole purpose of the law of warranty is to determine what it is that the seller has in essence agreed to sell, [and therefore,] the policy is adopted of those cases which refuse except in unusual circumstances to recognize a material deletion of the seller's obligation. Thus, a contract is normally a contract for a sale of something describable and described.

If the purpose of the law of warranty is to determine what a seller has agreed to sell, it should not matter that the buyer did not rely on a seller's statements in purchasing particular goods. The seller is bound to deliver, and the buyer to accept, goods that conform to the seller's statements or descriptions of what is being sold. The gist of a breach of express warranty action thus focuses on (1) what the seller agreed to sell; and (2) whether the product delivered by the seller complied with the statements or description of what the seller agreed to sell.

Second, Official Comments 3 and 8 to UCC 2–313 explain that,

3. The present section deals with affirmations of fact by the seller, descriptions of the goods or exhibitions of samples, exactly as any other part of a negotiation which ends in a contract is dealt with. No specific intention to make a warranty is necessary if any of these factors is made part of the basis of the bargain. In actual practice *affirmations of fact made by the seller about the goods during a bargain are regarded as part of the description of those goods; hence no particular reliance on such statements need be shown in order to weave them into the fabric of the agreement.* Rather, any fact which is to take such affirmations, once made, out of the agreement requires clear affirmative proof. The issue normally is one of fact.

* * *

8. Concerning affirmations of value or a seller's opinion or commendation under subsection (2), the basic question remains the same: What statements of the seller have in the circumstances and in objective judgment become part of the basis of the bargain? As indicated above, *all of the*

*statements of the seller do so unless good reason is shown to the contrary....*

(Emphases added.)

The foregoing comments reflect a clear intent on the part of the framers of the UCC that a buyer need not show reliance on a seller's statements in order for such statements to become "part of the basis of the bargain" between the seller and buyer. It is not necessary, therefore, for a buyer to show that he or she would not have entered into the agreement absent the seller's statements or even that the seller's statements were a dominant factor inducing the agreement. Rather, the dispositive issue is whether the seller's statements became "part of the basis of the bargain."

Third, the framers of the UCC purposely abandoned the USA reliance test in favor of the basis of the bargain test. In light of this change, it would be illogical, in our view, to construe the basis of the bargain test as requiring a buyer's reliance on a seller's statements. On the other hand, as Official Comment 3 makes clear, a buyer's *nonreliance* on a seller's statements would be relevant to show that the seller's statements did not become a part of the basis of the bargain between the buyer and seller.

2. *What Statements by a Seller Become Part of the Basis of the Bargain Between the Buyer and the Seller*

■ To be effective as an express warranty, a seller's statement must be "part of the basis of the bargain" between the seller and the buyer. HRS § 490:2–313. The determination of whether a seller's statement is "part of the basis of the bargain" is a question of fact. Official Comment 3 to UCC 2–313; *Pack & Process, Inc. v. Celotex Corp.,* 503 A.2d 646 (Del.Super.1985).

The Official Comments to UCC 2–313 express the general notion that statements about goods made by a seller to a buyer during the bargaining process are *presumed* to be a part of the "basis of the bargain" between a seller and buyer. For example, Official Comment 3 states that

pared by The American Law Institute and the National Conference of Commissioners on Uni-

form State Laws as they appear in the '1962 Official Text.' "

in actual practice *affirmations of fact made by the seller about the goods during a bargain are regarded as part of the description of those goods;* hence no particular reliance on such statements need be shown in order to weave them into the fabric of the agreement. Rather, *any fact which is to take such affirmations, once made, out of the agreement requires clear affirmative proof.*

(Emphases added.) Also, Official Comment 6 states in relevant part that "in general, the presumption is that any sample or model just as any affirmation of fact is intended to become a basis of the bargain." Finally, Official Comment 8 provides:

Concerning affirmations of value or a seller's opinion or commendation under subsection (2), the basic question remains the same: What statements of the seller have in the circumstances and in objective judgment become part of the basis of the bargain? *As indicated above, all of the statements of the seller do so unless good reason is shown to the contrary. . . .*

(Emphasis added.)

█ In light of the foregoing comments, we conclude, as other jurisdictions have, that under the UCC, a seller's statements to a buyer regarding goods sold, made during the bargaining process, are presumptively part of the basis of the bargain between the seller and buyer. Therefore, the burden is on the seller to prove that the resulting bargain did not rest at all on the seller's statements. *Martin v. American Medical Sys., Inc.,* 116 F.3d 102, 105 (4th Cir.1997) (holding that "[a]ny description of the goods, other than the seller's mere opinion about the product, constitutes part of the basis of the bargain and is therefore an express warranty."); *Keith v. Buchanan,* 173 Cal.App.3d 13, 220 Cal.Rptr. 392, 398 (1985) (stating that "[a] warranty statement made by a seller is presumptively part of the basis of the bargain, and the burden is on the seller to prove that the resulting bargain does not rest at all on the representation"); *Bysom Enter. v. Peter Carlton Enter.,* 267 Ill.App.3d 1, 204 Ill.Dec. 408, 413, 641 N.E.2d 838, 843 (1994) (holding "that the fact that the warranties are in the Purchase Agreement is *prima facie* evidence

that they are part of the bargain. The burden of disproving this is upon [the seller.]") (citations omitted); *Daughtrey v. Ashe,* 243 Va. 73, 413 S.E.2d 336, 338 (1992) (determining that a seller's description of the goods that is not the seller's mere opinion, is "a representation that defines his [or her] obligation").

█ The presumption that a seller's statement becomes a part of the basis of the bargain can be overcome. For example, "[t]he buyer's actual knowledge of the true condition of the goods prior to the making of the contract may make it plain that the seller's statement was not relied upon as one of the inducements for the purchase[.]" *Keith v. Buchanan,* 220 Cal.Rptr. at 398. Similarly, "[w]here the buyer inspects the goods before purchase, he [or she] may be deemed to have waived the seller's express warranties." *Id.* Moreover, a seller's statement will not be given effect where "it could not have been part of the basis of the bargain because the buyer knew the statement to be false or was not influenced by it," or when the statement was not even made until after the sale. 67A Am.Jur.2d *Sales* § 725, at 91–92 (1985). For example, an advertisement is not usually regarded "as being made 'during a bargain[.]'" J. White, *Uniform Commercial Code* § 9–5, at 495 (4th ed.1995). Therefore, a plaintiff claiming a breach of express warranty based on an advertisement contained in a catalogue or brochure would normally have to prove, at a minimum, that he or she read, or at least was aware of, the catalogue or brochure. *Interco, Inc. v. Randustrial Corp.,* 533 S.W.2d 257 (Mo.App.1976) (holding that although no particular reliance on an express warranty contained in a seller's sales catalogue was necessary for recovery for breach of warranty, the sales catalogue must at least have been read to constitute an express warranty). In addition, the UCC "permits a seller a certain amount of leeway in making statements that exaggerate the value or quality of goods offered for sale." 67A Am.Jur.2d *Sales* § 732 at 98 (1985). Specifically, HRS § 490:2–313(2) provides that "an affirmation merely of the value of the goods or a statement purporting to be

merely the seller's opinion or commendation of the goods does not create a warranty."

### 3. *Whether Northwest's Size Description and Advertisements Constituted Express Warranties*

We now turn to the facts in the instant case to determine whether Northwest's description of Crane C204 as being equipped with thirty (30)-inch-wide treads and Northwest's advertisements as to the performance capabilities of its cranes constituted express warranties.

### a. *The Size Description*

█ Our examination of the evidence confirms that the Northwest Model 41 crane was described in contract documents as having 30-inch-wide treads. The purchase order sent by Wailuku to Northwest called for a "Northwest Model 41 special caneloader . . . with . . . 30 [-inch] double lug treads." Additionally, a shipping document instructed Northwest employees to "[p]lease prepare shipment of equipment in accordance with the following instructions[,]" and thereafter described the ordered equipment as "[o]ne (1) Northwest Model 41 Special Caneloader crawler mounted on 30[-inch] wide double lug alloy steel treads[.]" Northwest's shipping invoice used the same description of the C204 crane. Finally, Northwest's Machine Sale and Shipment Record indicated that Northwest was to "assemble machine" by attaching 30-inch double flange treads.

Since Northwest's affirmations of fact regarding the description of the crane appear on the face of the contract documents, the affirmations are presumed to have been part of the basis of the bargain between Northwest and Wailuku. *Bysom Enter. v. Peter Carlton Enter.*, 204 Ill.Dec. at 413, 641 N.E.2d at 843 (fact that warranties are in purchase agreement is *prima facie* evidence that they are part of the bargain; burden of disproving this is upon the seller).

Our review of the record further indicates that no evidence was introduced by Northwest to prove that Wailuku did not rely on the size of the crane's treads as a basis for its decision to purchase the Model 41 crane. Accordingly, we conclude that Northwest's

contractual description of the crane as being equipped with 30-inch-wide treads was a part of the basis of Northwest's bargain with Wailuku and constituted an express warranty which Northwest clearly breached when it delivered a crane with 24-inch-wide treads.

### b. *Northwest's Advertisements*

At trial, Plaintiffs offered into evidence as Plaintiffs' Exhibit 84 a Northwest Bulletin which stated that "Crawler Treads of 36-Inch width are now offered for new Model 41 machines to provide additional ground bearing area when working in poor soil conditions." Plaintiffs also introduced a Northwest circular, which marketed the Northwest Model 41 crane partly as follows:

> The Model 41 Crawler proved in years of service brings a *solid foundation that withstands the shocks of digging loads and gives trouble free operation.*
>
> * * *
>
> With Northwest Steering the operator has *two good "feet" under him at all times, with full traction that can save hours of time in wet or muddy going, permitting the operator and contractor to take full advantage of the short cuts.*

(Emphases added.)

Additionally, Northwest offered into evidence the General Specifications for the Model 41 "Jobmaster," which stated that the crane was "specifically designed for Dragline and Clamshell work where floatation and reach are factors."

█ The record includes no evidence, however, that the advertisements were given to Wailuku as part of the bargaining process, or that they were part of the literature given to Wailuku during shipping or as part of the contract documents, or that Wailuku read or was even aware of the foregoing advertisements. Therefore, we are unable to conclude that these advertisements became a part of the "basis of the bargain" between Northwest and Wailuku which amounted to an express warranty. Moreover, Plaintiffs' Exhibit 84 advertised a crane with *36*-inch-wide treads, not a crane with *30*-inch-wide treads which Wailuku ordered. Consequently,

Plaintiffs' Exhibit 84 could not have been a basis for Wailuku's purchase of a crane with 30–inch–wide treads and did not constitute an express warranty on Northwest's part. Finally, the statements contained in the remaining advertisements were opinion statements of the commercial value of the cranes, not affirmations of fact. Just as a manufacturer's representations in a sales brochure that a truck's cab room was "strong, light, leakproof" and the truck was "rock-solid" were ruled by a United States district court to be mere commercial puffery and not serious guarantees of indestructibility, *Jordan v. Paccar, Inc.,* 37 F.3d 1181, 1185 (6th Cir. 1994), we likewise conclude that Northwest's statements regarding the performance capabilities of the Northwest Model 41 crane did not constitute serious affirmations of fact that the crane would always be trouble-free.

### B. Whether Northwest's Breach of the Size Warranty Proximately Caused Torres's Injuries

In its charge to the jury regarding Plaintiffs' breach of express warranty claim, the circuit court instructed:

> Another theory upon which Plaintiffs seek to establish liability is breach of express warranty. A breach of express warranty may be established without proof of negligence on the part of the Defendant. *Plaintiffs must prove by a preponderance of the evidence that Northwest Engineering breached an express warranty and that the breach of express warranty was the legal cause of injuries or damage to the Plaintiffs.*

> \* \* \*

> An act or omission is a legal cause of an injury/damage if it was a substantial factor in bringing about the injury/damage.

> *The law does not say that there can be only one substantial factor which causes an injury/damage. On the contrary, many factors, or the conduct of more than one person, may operate independently or together to cause an injury/damage. In*

*such a case, each may be a legal cause of the injury/damage.*

(Emphases added.)

In granting Northwest's JNOV motion, the circuit court concluded, "based upon [the] issue of [legal] causation and the *Blockhead* case[,]" that Northwest's breach of express warranty was not the legal cause of Plaintiffs' injury. In *Blockhead, Inc. v. Plastic Forming Co., Inc.,* 402 F.Supp. 1017 (D.Conn.1975), the federal district court of Connecticut held that the plaintiff in a breach of warranty suit has the burden of demonstrating proximate cause and that the

> [s]atisfaction of that burden requires [the plaintiff] to demonstrate that the [breach] was the *probable* cause of the injuries. A showing that a defendant *possibly* caused the injuries is insufficient to impose liability where alternative explanations have not been disproven.

*Id.* at 1028–29 (emphasis in original).

Plaintiffs contend that in light of Hawai'i case law, the *Blockhead* test is not the proper standard to apply in determining proximate causation in a breach of warranty case. Plaintiffs argue that the applicable test is the "substantial factor" test that was read to the jury and has been embraced by the supreme court in the context of negligence actions.

We agree. The Hawai'i Supreme Court has long held, in the context of negligence actions, that

> [t]he best definition and the most workable test of proximate or legal cause so far suggested seems to be this: 'The actor's negligent conduct is a legal cause of harm to another if (a) his [or her] conduct is a substantial factor in bringing about the harm, and (b) there is no rule of law relieving the actor from liability because of the manner in which his [or her] negligence has resulted in the harm.'

*Mitchell v. Branch,* 45 Haw. 128, 132, 363 P.2d 969, 973 (1961). Under the *Mitchell* test, a

> defendant's negligence need not have been the whole cause or the only factor in bringing about the harm. It was enough that

his [or her] negligence was a substantial factor in causing plaintiff's injuries.

*Knodle v. Waikiki Gateway Hotel, Inc.,* 69 Haw. 376, 390, 742 P.2d 377, 386 (1987) (internal quotation marks and brackets deleted). More recently, in *Montalvo v. Lapez,* 77 Hawai'i 282, 289, 884 P.2d 345, 352 (1994), the supreme court reaffirmed the application of the *Mitchell* substantial factor test in negligence actions. In *Montalvo,* the supreme court was "convinced that 'substantial factor' is a phrase sufficiently intelligible to furnish an adequate guide in instructions to the jury, and that *it is neither possible nor desirable to reduce it to any lower terms." Id.* at 289, 884 P.2d at 352 (italics in original).

Inasmuch as the supreme court has adopted the substantial factor test for purposes of evaluating legal causation in negligence actions, we see no reason why legal causation should be measured by a different standard in breach of express warranty actions based on a seller's failure to deliver goods in conformance with an express promise, affirmation of fact, or description.

In this case, therefore, the circuit court applied the wrong legal cause standard in entering its JNOV order as to Plaintiffs' breach of express warranty claim.

Northwest maintains that even if the circuit court applied the wrong legal cause standard, the JNOV order was still properly entered on other grounds. For the circuit court's assistance on remand, we briefly discuss these issues.

C. *Whether Northwest Could be Liable for Consequential Personal Injury Damages or Breach of Express Warranty When the Jury Found that Crane C204 Was Not Defectively Designed*

The Hawai'i Supreme Court has stated that "where a plaintiff seeks to recover for personal injury in warranty the elements of the action should be governed by the same policies which presently shape the elements of a tort strict products liability claim." *Larsen v. Pacesetter Systems, Inc.,* 74 Haw. 1, 22, 837 P.2d 1273, 1284 (1992). The reason for applying the elements for tort strict products liability is that "the tort action for strict products liability is the warranty action for tangible injury to persons and property stripped of its contractual mask." *Id.* at 22, 837 P.2d at 1284. Under the doctrine of strict products liability as adopted in this jurisdiction,

> where a seller or lessor, who is engaged in the business of selling or leasing a product, sells or leases a defective product which is dangerous to the user or consumer, and injury results from its use or consumption, the seller or lessor will be held strictly liable in tort for the injury.

*Ontai v. Straub Clinic & Hosp., Inc.,* 66 Haw. 237, 241, 659 P.2d 734, 739 (1983).

 In order to make out a *prima facie* case of strict products liability, a plaintiff must "prove (1) a defect in the product which rendered it unreasonably dangerous [7] for its intended or reasonably foreseeable use; and (2) a causal connection between the defect and the plaintiff's injuries." *Tabieros v. Clark Equipment Co.,* 85 Hawai'i 336, 354, 944 P.2d 1279, 1298 (1997) (citation and brackets omitted). "A product may be defective under any one of three general theories: defective manufacture; defective design; or insufficient warning." *Id.* at 353, 944 P.2d at 1296 (citing *Wagatsuma v. Patch,* 10 Haw. App. 547, 564, 879 P.2d 572, 583 (1994); brackets and internal quotation marks omitted).

 We have already concluded that Northwest breached its express warranty to deliver to Wailuku a crane with 30–inch–wide treads. In order to prevail on a claim for the tort of breach of express warranty, therefore, Plaintiffs were required to demonstrate that

---

7. In *Stewart v. Budget Rent–a–Car Corp.,* 52 Haw. 71, 470 P.2d 240 (1970), the Hawai'i Supreme Court specifically eliminated the *Second Restatement on Torts* § 402A requirement that a defective product must have been "unreasonably dangerous" to the user or consumer in order to establish a strict products liability claim. It is sufficient that a product be "dangerously defective." *Ontai v. Straub Clinic & Hosp., Inc.,* 66 Haw. 237, 241, 659 P.2d 734, 739 (1983). It appears that under *Tabieros,* the "unreasonably dangerous" standard is now the requirement for a strict products liability claim.

the crane which Northwest delivered to Wailuku in breach of this express warranty had a defect which rendered the crane unreasonably dangerous for its intended or reasonably foreseeable use and that the crane's defects proximately caused Torres's injuries. Northwest contends that because the jury found that Crane C204 "was not defective," Plaintiffs' claim for breach of express warranty must fail as a matter of law. We disagree.

The jury did not return a finding that the crane "was not defective." Although the jury was asked to determine whether Northwest negligently designed the Model 41 crane, negligently failed to warn Torres of a danger associated with the use of the Model 41 crane, and negligently failed to include a safety device on the Model 41 crane operated by Torres, the only interrogatory which the jury was asked to answer relevant to Plaintiffs' strict liability claim was whether the crane was defectively designed. The jury was never asked to determine whether the crane was defective under any alternate theory of recovery, even though Plaintiffs did present evidence that the crane was defective because it did not have a warning device and had treads that were too narrow. The jury's limited finding that the crane was not defectively designed did not amount to a finding that the crane had no defects which rendered it unreasonably dangerous for its intended or reasonably foreseeable use, thus defeating Plaintiffs' breach of express warranty claim for personal injuries.

### D. Whether the Statute of Limitations Barred Plaintiffs' Claim for Breach of Express Warranty

HRS § 490:2–725 (1993) provides, in relevant part, as follows:

**Statute of limitations in contracts for sale.** (1) *An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued.* By the original agreement the parties may reduce the period of limitation to not less than one year but may not extend it.

(2) *A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made,* except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

(Emphases added.)

■ In *Larsen v. Pacesetter Systems, Inc.*, the supreme court held that the UCC statute of limitations applied to breach of implied warranty claims for personal injury. 74 Haw. at 11, 837 P.2d at 1280. We similarly conclude that the UCC statute of limitations applies to a breach of express warranty claim for personal injury.

There seems to be no dispute in this case that Northwest tendered delivery of Crane C204 to Wailuku in April 1973. Pursuant to HRS § 490:2–725, therefore, the statute of limitations for any breach of express warranty claim against Northwest began to run in April 1973 and Wailuku would clearly have been barred from initiating its own claim against Northwest for breach of express warranty. *In accord, Waldrop v. Peabody Galion Corp.*, 423 So.2d 145 (Ala.1982); *Armour v. Alaska Power Authority*, 765 P.2d 1372 (Alaska 1988); *Johnson v. Hockessin Tractor, Inc.*, 420 A.2d 154 (Del.1980); *Patton v. Mack Trucks, Inc.*, 360 Pa.Super. 1, 519 A.2d 959 (1986); *Ogle v. Caterpillar Tractor Co.*, 716 P.2d 334 (Wyo.1986).

■ Plaintiffs did not bring the immediate action for breach of express warranty until May 27, 1988, over fifteen years after the date of Northwest's breach. However, Northwest did not raise the affirmative defense of statute of limitations in its answer to Plaintiffs' complaint and waited until after trial to file a motion to amend its answer to allege the defense. Arguably, therefore, Northwest has waived the defense. On remand, the circuit court should decide this issue.

### II. Plaintiffs' PJNOV Motion: Whether Plaintiffs' Recovery Is Barred or Reduced by Torres's Contributory Negligence

Because the circuit court granted Northwest's JNOV motion, it found it unnecessary

to address the issues presented by Plaintiffs' PJNOV motion and accordingly, denied the motion. In light of our vacatur of the circuit court's JNOV order, we discuss the issues presented by the PJNOV motion for the edification of the circuit court on remand.

In their PJNOV motion, Plaintiffs requested that (1) the circuit court enter judgment on their breach of express warranty claim without any reduction of damages for Torres's eighty-five percent (85%) comparative fault, or (2) in the alternative, that "pure" comparative fault principles be applied to reduce, but not bar, their recovery.

The Hawai'i appellate courts have not yet been called upon to determine whether comparative negligence principles should be applied to reduce a plaintiff's recovery in breach of express warranty actions. However, the Hawai'i Supreme Court has applied comparative negligence principles in other types of non-negligence cases.

In *Kaneko v. Hilo Coast Processing*, 65 Haw. 447, 654 P.2d 343 (1982), the supreme court was asked to determine "whether the doctrine of comparative negligence should merge with strict products liability." *Id.* at 459, 654 P.2d at 351. The supreme court, after extensively analyzing the issue, held that "comparative negligence [was] not incompatible with strict products liability" and should be applied to reduce awards for strict products liability claims. *Id.* at 461, 654 P.2d at 352. The court reasoned that "[t]he inter-

jection of comparative negligence into strict products liability will reduce an injured plaintiff's award by an amount equal to the degree to which he is culpably and contributorily negligent. Such a system will accomplish a fairer and more equitable result[,]" *id.* at 461, 654 P.2d at 352, and "eliminate the harshness of the 'all or nothing' bar to recovery that results if a plaintiff is found to have misused the product or to have assumed the risk of using the product." *Id.* at 464, 654 P.2d at 354.

It was not entirely clear under *Kaneko*, however, whether the supreme court had merged strict liability with the doctrine of modified comparative negligence, as set forth in HRS § 663–31 (1993),[8] or the doctrine of "pure" comparative negligence, by which a plaintiff's contributory negligence serves only to reduce, but not completely bar, recovery. This confusion was laid to rest in *Armstrong v. Cione*, 69 Haw. 176, 738 P.2d 79 (1987), where the supreme court concluded that pure comparative negligence principles were applicable to reduce a plaintiff's recovery in strict products liability cases. The supreme court reasoned that

Our desire to protect consumers and hold manufacturers and distributors accountable for placing unsafe goods in the market is best served by insuring that application of comparative negligence principles does not inadvertently create an "all or nothing" bar to plaintiffs' recovery.

---

8. Until 1969, Hawai'i applied the doctrine of contributory negligence to bar recovery by any person seeking damages for negligence. "A legislative perception of unfairness in the common law doctrine of contributory negligence led to the passage of our modified comparative negligence statute in 1969." *Wong v. Hawaiian Scenic Tours, Ltd.*, 64 Haw. 401, 403–04, 642 P.2d 930, 932 (1982). The modified comparative negligence statute, HRS § 663–31 (1993), provides in relevant part as follows:

**Contributory negligence no bar; comparative negligence; findings of fact and special verdicts.** (a) Contributory negligence shall not bar recovery in any action by any person or the person's legal representative to recover damages for negligence resulting in death or in injury to person or property, if such negligence was not greater than the negligence of the person or in the case of more than one person, the aggregate negligence of such persons against whom recovery is sought, but any dam-

ages allowed shall be diminished in proportion to the amount of negligence attributable to the person for whose injury, damage or death recovery is made.

\* \* \*

(c) Upon the making of the findings of fact or the return of a special verdict, as is contemplated by subsection (b) above, the court shall reduce the amount of the award in proportion to the amount of negligence attributable to the person for whose injury, damage or death recovery is made; provided that if the said proportion is greater than the negligence of the person or in the case of more than one person, the aggregate negligence of such persons against whom recovery is sought, the court will enter a judgment for the defendant.

Under the modified comparative negligence scheme set forth in HRS § 663–31 (1993), then, a plaintiff's recovery for damages for negligence is either reduced or completely barred by the plaintiff's own negligence.

Employing modified comparative negligence principles in the strict products liability context would create such a bar by "allowing a defendant to escape liability which the jury has allocated to him [or her], irrespective of the responsibility allocated to the plaintiff."

Moreover, our desire to create economic incentives for safer products is best served by preventing the creation of a complete bar to plaintiffs' recovery where the manufacturer or distributor is partially responsible for the injuries sustained. Such a bar would result in inefficient economic incentives to produce safe products.

*Id.* at 182, 738 P.2d at 82–83 (citations omitted). In light of these policy considerations, the supreme court held that pure comparative negligence principles should be applied in the realm of strict products liability actions. *Id.* at 180–83, 738 P.2d at 82–83.

Subsequently, in *Larsen v. Pacesetter Systems, Inc.*, 74 Haw. at 33, 837 P.2d at 1290, the Hawai'i Supreme Court broadened the concept of comparative fault even further when it "merged pure comparative negligence with personal injury suits in implied warranty." In *Larsen*, the supreme court was also called upon to determine whether a plaintiff's assumption of risk served to reduce or bar a plaintiff's recovery for breach of implied warranty. The court held that a plaintiff's *express* assumption of risk, which is essentially contractual in nature, "survives the merger with comparative negligence in products liability cases and . . . is available as a separate defense that may bar plaintiff's recovery in tort and warranty strict products liability actions." *Id.* at 36, 837 P.2d at 1291. Additionally, a plaintiff's "secondary implied assumption of risk," i.e., the actions of a plaintiff who knows of the danger presented by a defendant's negligence and proceeds voluntarily and *unreasonably* to encounter it, is a potential bar to a plaintiff's recovery.[9] *Id.* at 36, 837 P.2d at 1291. However, an "assumption of risk that is a form of contributory negligence serves to reduce, rather than bar, plaintiffs' recoveries." *Id.* at 33–34,

837 P.2d at 1290. The court explained that an assumption of risk is an implied form of contributory negligence where it is "primary"—i.e. "the plaintiff has entered voluntarily and *reasonably* into some relation with a defendant, which plaintiff knows to involve the risk." *Id.* at 35, 837 P.2d at 1290 (emphasis added).

The Hawai'i Supreme Court has stated that breach of express or implied warranty actions couched in tort are governed by strict liability principles. Inasmuch as the supreme court has applied "pure" comparative negligence principles to reduce, rather than bar a plaintiff's recovery of damages in strict liability and breach of implied warranty cases, we believe that it is logical that "pure" comparative negligence principles should also be applied to reduce a plaintiff's recovery in those tort actions for breach of express warranty where a plaintiff is found to be negligent. Since the defense of assumption of risk was not raised as an issue in this case, we need not determine whether a plaintiff's assumption of risk, under certain circumstances, could serve to totally bar a plaintiff's recovery in a breach of express warranty tort action.

III. *Northwest's Motion for Directed Verdict as to Plaintiffs' Breach of Implied Warranty Claims*

In *Ontai v. Straub Clinic and Hosp., Inc.*, 66 Haw. 237, 250, 659 P.2d 734, 744 (1983), the Hawai'i Supreme Court recognized that whether or not an implied warranty arises in any particular case "is basically a question of fact to be determined by the circumstances of the contracting." Relying on *Ontai*, Plaintiffs contend that the circuit court was wrong in granting Northwest's motion for directed verdict as to their claims for breach of IWM and IWF.

A directed verdict may be granted only where, considering the evidence and the inferences therefrom in the light most favorable to the non-moving party, there can be

9. The supreme court did not indicate whether in such instances a plaintiff's recovery would be completely barred pursuant to the common law doctrine of contributory negligence, or only

barred if, pursuant to HRS § 663–31 (1993), the modified comparative negligence statute, the plaintiff's negligence exceeded the defendant's negligence.

but one reasonable conclusion as to the proper judgment. *Carr v. Strode*, 79 Hawai'i at 486, 904 P.2d at 500. We apply the foregoing standard in reviewing the propriety of the granting of the directed verdict for each implied warranty.

A. *Implied Warranty of Merchantability*

HRS § 490:2–314(1) (1993), which is Hawai'i's codification of UCC 2–314's IWM provision, states in relevant part:

> (1) Unless excluded or modified ( [under] section 490:2–316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind....

> (2) Goods to be merchantable must be at least such as

> \* \* \*

> (c) Are fit for the ordinary purposes for which such goods are used[.]

The Hawai'i Supreme Court has stated that

> [t]he implied warranty of merchantability is perhaps the broadest warranty in the Uniform Commercial Code. This warranty is implied by operation of law into every sale of goods by a merchant seller. Merchantability, as provided in Hawaii's [Hawai'i's] statute, means *inter alia*, that the goods "are fit for the ordinary purpose for which such goods are used."

*Ontai v. Straub Clinic and Hospital, Inc.*, 66 Haw. at 249–50, 659 P.2d at 744. However, "to bring an action in implied warranty for personal injury[,] a plaintiff is required to show product unmerchantability sufficient to avoid summary judgment on the issue of defectiveness in a tort strict products liability suit." *Larsen v. Pacesetter Systems, Inc.*, 74 Haw. at 22, 837 P.2d at 1284–85. In this regard, the supreme court has stated:

> The rules defining and governing an implied warranty or tort products liability action for personal injuries must serve the purposes for which products liability is imposed. Thus, a court should determine whether a plaintiff has met his [or her] burden of showing a *prima facie* case of product defectiveness in light of the poli-cies that have supported judicial development of the implied warranty and tort strict products liability action for personal injuries.... Policies justifying the development of the implied warranty and strict torts products liability action include:

> 1) Liability will compensate consumers or users whose expectations are frustrated by the defective product.

> 2) The costs of injury due to defective products may best be borne by enterprisers who make and sell the product, profit from sales, and who can shift the costs to purchasers.

> 3) Liability will promote product safety by eliminating the necessity of proving negligence.

*Id.* at 22–23, 837 P.2d at 1285.

Northwest argued in its motion for directed verdict that Plaintiffs had failed to show that the Northwest Model 41 which was delivered to Wailuku was unfit for its ordinary purpose of sugarcane loading. To support its contention, Northwest pointed to the undisputed evidence that Crane C204 had been used by Wailuku for nearly fourteen years without any changes in tread size and that Wailuku continued to use the crane after the accident with no modifications.

We conclude, however, that there was sufficient evidence in the record for the jury to decide that Crane C204 was defective and not merchantable. Plaintiffs' mechanical engineering expert, Martin, testified that in his opinion, the crane had treads which were too narrow to be used safely for sugarcane operations on soft ground or sloped conditions. He also testified that the crane was defective because it did not have a load moment device, which would have given the operator information on the amount of load being lifted. The evidence also revealed that Northwest's sales representative, David Branson, visited Wailuku in January 1966 and expressed concern that "[Wailuku's] operators tip up the machines then brace themselves against the control levers, braking [sic] them off."

We conclude, therefore, that the circuit court should have allowed Plaintiffs' claim for breach of IWM to be submitted to the jury.

### B. *Implied Warranty of Fitness for Particular Purpose*

HRS § 490:2–315 (1993), which relates to an IWF, provides:

**Implied warranty: fitness for particular purpose.** Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that *the buyer is relying on the seller's skill or judgment to select or furnish suitable goods,* there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.

(Emphasis added.)

■ Northwest argues that Plaintiffs failed to show any evidence that Wailuku actually relied on Northwest's skill or judgment in purchasing the Northwest Model 41 crane, a key element in proving their breach of IWF claim under HRS § 490:2–315. Our examination of the trial record confirms Northwest's assertion. Thus, we conclude that the circuit court properly granted Northwest's motion for directed verdict on this claim.

### IV. *Anna's and Carol's Damages Recovery*

Anna and Carol assert that regardless of the outcome of Torres's breach of express warranty claim, they are still entitled to their damages award based on their independent claims of wrongful death and NIED. In response, Northwest contends that Anna's and Carol's "claims are derivative in nature" and thus, should also be reduced by the amount of fault attributed to Torres.

To settle this dispute, we consider, in turn, whether Anna's and Carol's claims for wrongful death and NIED are derivative or independent.

### A. *The Wrongful Death Claim*

Hawai'i's wrongful death statute, codified in HRS § 663–3 (1993), is silent on the issue of whether a wrongful death claimant's cause of action is independent or derivative. However, the supreme court has determined that a wrongful death claim is derivative in nature and consequently, if the decedent has no cause of action, the survivors also have no cause of action. *Winters v. Silver Fox Bar,* 71 Haw. 524, 535–36, 797 P.2d 51, 56 (1990); *Bertelmann v. Taas Assoc.,* 69 Haw. 95, 103, 735 P.2d 930, 935 (1987).

In this case, the jury found Northwest liable only for breach of express warranty. HRS § 663–3 states in relevant part:

**Death by wrongful act.** When the death of a person is caused by the *wrongful act, neglect, or default of any person,* the deceased's legal representative, or any of the persons hereinafter enumerated, may maintain an action against the person causing the death or against the person responsible for the death. . . .

In any action under this section, such damages may be given as under the circumstances shall be deemed fair and just compensation, with reference to the pecuniary injury and loss of love and affection, including (1) loss of society, companionship, comfort, consortium, or protection, (2) loss of marital care, attention, advice, or counsel, . . . or (4) loss of parental care, training, guidance, or education, suffered as a result of the death of the person by the surviving spouse, children, father, mother, and by any person wholly or partly dependent upon the deceased person. . . .

(Emphasis added.) The question that thus arises is whether a wrongful death claim can be based on a breach of express warranty action for personal injuries resulting in death. The dispositive issue in this regard is whether a breach of express warranty constitutes a "wrongful act, neglect, or default of any person."

When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is obtained primarily from the language contained in the statute itself. Where the language of a statute is plain and unambiguous, our only duty is to give effect to the statute's plain and obvious meaning. Further, in interpreting a statute, we give the words their common meaning, unless there is something in the statute requiring a different interpretation.

*Furukawa v. Honolulu Zoological Soc'y,* 85 Hawai'i 7, 12, 936 P.2d 643, 648 (1997) (citation omitted).

 The common meaning of the word "default" is "[a] failing or failure; an omission of that which ought to be done; ... To fail in fulfilling or satisfying an engagement, claim, contract, or agreement...." *The New Webster Encyclopedic Dictionary of The English Language* at 223–24 (1971). *Black's Law Dictionary* (6th ed.1990) similarly defines "default" as "[t]he omission or failure to perform a legal or contractual duty, to observe a promise or discharge an obligation, or to perform an agreement." *Id.* at 417 (citations omitted). In light of the common definition of "default," a breach of express warranty, which is a failure to fulfill obligations under an agreement is clearly a "default." Therefore, a breach of express warranty action could be a basis for a derivative wrongful death action brought pursuant to HRS § 663–3.

Other jurisdictions with wrongful death statutes similar to Hawai'i's have likewise permitted wrongful death actions to be predicated on breach of warranty claims. For example, in *Greco v. S.S. Kresge Co.,* 277 N.Y. 26, 12 N.E.2d 557 (1938), New York's Court of Appeals considered whether a wrongful death claimant could recover for personal injury damages resulting from a breach of implied warranty. *Id.,* 12 N.E.2d at 559. New York's wrongful death statute provided that:

> The executor or administrator duly appointed in this state ... of a decedent who has left him or her surviving a husband, wife, or next of kin, may maintain an action to recover damages for a *wrongful act, neglect or default,* by which the decedent's death was caused, against a natural person who, or a corporation which, would have been liable to an action in favor of the decedent by reason thereof if death had not ensued.

*Id.* at 560 (emphasis added) (citing § 130 of New York's Decedent Estate Law). The *Greco* court initially sought to classify a breach of warranty as an action either in tort or contract. The court observed, however, that "the distinction between torts and

breaches of contract is, ofttimes, so dim and shadowy that no clear line of delineation may be observed and no accurate or satisfactory definition of either may be formulated." *Id.* at 561 (citations omitted). The court then concluded that "[u]nder each cause of action, whether framed in tort or on contract, default or breach of duty involves an injury." *Id.*

Continuing with its analysis, the New York court analyzed the terms "wrongful act, neglect, and default." *Id.* The court stated that a "[v]iolation of a duty owing to another is a wrongful act" and the "breach of a contract involving violation of duty is a wrongful act." *Id.* Therefore, although "the action may be brought solely for the breach of the implied warranty, the breach is a wrongful act, a default, and, in its essential nature, a tort." *Id.*

In *Ayala v. Joy Mfg. Co.,* 580 F.Supp. 521 (D.Colo.1984), the issue of whether a breach of express or implied warranty could be the basis of a wrongful death claim was before the court. Colorado's wrongful death statute permitted the bringing of a wrongful death action when the "death of a person [was] caused by a *wrongful act, neglect, or default[.]*" *Id.* at 523 (citing Colo.Rev.Stat. § 13–21–202) (emphasis added). Although there were no Colorado cases directly on point, the court looked to Colorado case law and initially determined that a "wrongful death remedy is not dependent upon the characterization of the action as either a tort or a contract action." *Id.* at 524. The court acknowledged that courts in other jurisdictions had held that because wrongful death actions are essentially punitive in nature, and because punitive damages are not awardable for breaches of contract, no claim for wrongful death could be maintained for breach of express warranty. However, the court held that "the better reasoned cases are those which hold that claims for breach of contract may be maintained as wrongful death actions." *Id.* at 523–24. Consequently, the *Ayala* court construed the meaning of "wrongful act" and "default" in broad terms, to encompass not only tortious acts, but also breaches of express warranty. *Id.* at 524.

Courts in other jurisdictions have determined that a breach of warranty action cannot form a basis for derivative recovery under a wrongful death statute. *See Whiteley v. Webb's City*, 55 So.2d 730 (Fla.1951); *Sugai v. General Motors Corp.*, 130 F.Supp. 101 (D.Idaho, S.D.1955). In *Whiteley*, the supreme court of Florida dismissed a wrongful death action brought by the personal representative of a deceased person on grounds that the

> plain words used in the title and body of the [applicable Florida wrongful death statutes] would seem to remove any doubt that they are limited to remedies where death results from the wrongful or tortious acts of the defendant and have no application to breach of promise or contractual obligations.

55 So.2d at 731–32.

Similarly, the court in *Sugai* interpreted Idaho's wrongful death statute, which permitted a wrongful death action when death of a person "is caused by the wrongful act or neglect of another," to mean that the plaintiffs must first allege and prove that the defendants were guilty of tortious conduct before a breach of implied warranty action would suffice as a basis for a wrongful death action. 130 F.Supp. at 103.

In Hawai'i, the supreme court has already determined that "where a plaintiff seeks to recover for personal injury in warranty, the elements of the action should be governed by the same policies which presently shape the elements of a *tort* of strict liability claim." *Larsen v. Pacesetter Systems, Inc.*, 74 Haw. at 23, 837 P.2d at 1284. Since a breach of express or implied warranty claim for personal injuries is couched in tort, even under the reasoning of the *Whiteley* and *Sugai* courts, a wrongful death claim could be premised on such a claim.

Relying on *Rohlfing v. Moses Akiona, Ltd.*, 45 Haw. 373, 369 P.2d 96 (1961), in which the supreme court stated that "[t]he family and dependents have a separate cause of action in their own right ..." under wrongful death, *id.* at 388, 369 P.2d at 104, Plaintiffs argue that wrongful death is an independent claim. The *Rohlfing* statement upon which Plaintiffs rely, however, was used in a completely different context than what is at issue in this case. The inquiry in *Rohlfing* was whether the damages awarded to a decedent's estate under the survival statute was considered a double recovery when the decedent's survivors also brought a wrongful death action. The quoted statement merely established that it was not a duplicate recovery since the decedent's survivors were entitled to a separate *right of recovery* apart from an award in a survivor's action; it did not intend to authorize a separate *cause of action* independent from the claim of the decedent.

### B. *Anna's and Carol's NIED Claim*

Anna and Carol assert that their recovery based on NIED is independent from Torres's claims and thus, should not be reduced in accordance with the degree of Torres's comparative fault.

Recently, in *Tabieros v. Clark Equip. Co.*, the Hawai'i Supreme Court discussed whether a spouse's NIED claims were "derivative" or "independent" and stated in relevant part as follows:

> [U]nder Hawai'i law, a spouse's claim of emotional distress, based on an injury to her husband [or his wife], is a derivative claim sounding in tort. However, such claims
>
>> are only derivative in the sense that they do not arise unless one's spouse has sustained a personal injury. The ... claim is a claim for damages independent and separate from the spouse's claim for damages. Thus, while *these types of derivative claims are barred when the victim's initial claim of injury cannot be maintained, and are subject to defenses premised on the injured spouse's contributory or comparative negligence*, it does not inevitably follow ... that they are not otherwise separable.
>
> ....
>
>> ... Although [the spouse's] claims are "derivative" in the sense that they arise out of an alleged tortious injury to [her husband or his wife] ..., they are separable from his [or hers], and her [or his]

potential damages are not coextensive with his [or hers].

Slip op. at 33 (emphasis added, citations and internal quotation marks deleted).

██ Plaintiffs are thus correct in maintaining that NIED claims are separable and independent for purposes of calculating damages. However, since their claims are still "derivative in the sense that they arise out of an alleged tortious injury to" Torres, their claims would be barred if, upon remand, Northwest were determined not to be liable to Torres on any of the theories of recovery alleged by Plaintiffs.

### CONCLUSION

Based on the foregoing, we vacate (1) the January 21, 1992 Judgment in favor of Northwest, (2) the January 21, 1992 order granting in part Northwest's motion for JNOV or in the alternative, for new trial, amendment of judgment, relief from judgment and remittitur, and (3) that part of the December 18, 1992 order which granted Northwest's motion for directed verdict as to Plaintiffs' IWM claim. We affirm that part of the December 18, 1992 order which granted Northwest's motion for directed verdict as to Plaintiffs' claims for breach of IWF and for punitive damages.

We also remand this case to the circuit court with instructions that it determine whether Northwest should be allowed to amend its answer to state a statute of limitations defense as to the breach of express and implied warranty claims. If the circuit court determines that the statute of limitations defense has been waived and refuses to allow amendment of Northwest's answer, the circuit court shall conduct a new trial on Plaintiffs' breach of express warranty and IWM claims in accordance with the principles set forth in this opinion. If a new trial is held and Northwest is found liable for breach of either express warranty or IWM, Plaintiffs' award for any wrongful death or NIED damages shall be reduced by the percentage of Torres's comparative fault.